<pre>
 1                UNITED STATES BANKRUPTCY COURT

 2               NORTHERN DISTRICT OF CALIFORNIA

 3                     (OAKLAND DIVISION)

 4   In re:

 5   SHAHAB EDDIN FOTOUHI,          Case No. 05-44839 N7

 6                                  Chapter 7

 7                                  Oakland, California
                                    April 27, 2009
 8                                  9:34 a.m.
             Debtor.
 9   _____/

10   PAUL MANSDORF, CHAPTER 7 TRUSTEE,

11           Plaintiff,
        v.                          A.P. No. 07-4129 AN
12
     SHAHAB EDDIN FOTOUHI,
13
             Defendant.
14   _____/

15   PAUL MANSDORF, CHAPTER 7 TRUSTEE,

16           Plaintiff,
        v.                          A.P. No. 07-4107 AN
17
     DARREN EPPS, WENDY HILLGER,
18   MICHAEL GILROY,

19           Defendants.
     _____/
20
     PAUL MANSDORF, CHAPTER 7 TRUSTEE,
21
             Plaintiff,
22      v.                          A.P. No. 08-4107 AN

23   FOTOUHI, EPPS, HILLGER &
     GILROY, LLP,
24
             Defendants.
25   _____/
</pre>

1              TRANSCRIPT OF TRIAL PROCEEDINGS

2

3        BEFORE THE HONORABLE RANDALL J. NEWSOME
           UNITED STATES BANKRUPTCY JUDGE

4  APPEARANCES:

5  For the Defendants:      COLLETTE ERICKSON, FARMER &
                     O'NEILL, LLP
6                     BY: ROD DIVELBISS, ESQ., ESQ.
                     235 Pine Street, Suite 1300
7                     San Francisco, California 94104

8

9

10  For the Plaintiff:       GOLDBERG, STINNETT, DAVIS &
                     LINCHEY
                     BY: DENNIS D. DAVIS, ESQ.
11                   44 Montgomery Street, Suite 2900
                     San Francisco, California 94104

12

13

14  Court Recorder:          LA TIA J. SANDERS
                     UNITED STATES BANKRUPTCY COURT
                     1300 Clay Street
15                     Oakland, California 94612

16

17

18  Transcription Service:   Jo McCall
                     Electronic Court
                     Recording/Transcribing
19                     2868 E. Clifton Court
                     Gilbert, AZ 85295
20                     Telephone: (480) 361-3790

21

22

23

24

25

Case: 07-04107   Doc# 34   Filed: 06/06/09   Entered: 06/06/09 13:03:46   Page 2 of 140

INDEX

Opening Statements:                                    Page

    By Mr. Divelbiss                                    5

                              Voir
Plaintiff's Witnesses:    Direct Dire Cross Redirect Recross

Pierotti, Richard L.

    By Mr. Davis           10
                           33
    By the Court                 24

    By Mr. Divelbiss                   50


Mansdorf, Paul Jordan

    By Mr. Davis           68

    By Mr. Divelbiss                   69


Defense Witnesses:

Fotouhi, Shahab Eddin

    By Mr. Divelbiss:      82

Mahta, Dr. Charles

    By Mr. Divelbiss       93

    By Mr. Davis                 95   108


Closing Arguments:                                     Page

By Mr. Davis                                          114

By Mr. Divelbiss                                     117

Case: 07-04107   Doc# 34   Filed: 06/06/09   Entered: 06/06/09 13:03:46   Page 3 of
140

1                    E X H I B I T S

2   Plaintiff'S Exhibits:                          Evid.

3
    1    Mr. Pierotti's initial report              34
4
    2    Mr. Pierotti's second report               49
5
    3, 4, 5 and 6                                   76
6

7
    Defense Exhibits:
8

9   C    Mr. Tregellis' report                      104

10  A and B                                         114

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    P R O C E E D I N G S

 2   April 27, 2009                       9:34 a.m.

 3                         -oOo-

 4             THE CLER: This is the United States Court for the

 5   Northern District of California, The Honorable Randall J.

 6   Newsome presiding.  Please be seated.

 7             THE COURT: Good morning, this is Mansdorf versus

 8   Fotouhi, Epps, Hillger and Gilroy; Mansdorf versus Fotouhi;

 9   and Mansdorf versus Epps, Hilger and Gilroy, in three

10   consolidated adversary proceedings for trial.  Would you

11   like to make appearances?

12             MR. DAVIS: Good morning, Your Honor, Dennis Davis

13   appearing for Paul Mansdorf, Trustee and Plaintiff.

14             MR. DIVELBISS: Good morning, Your Honor, Rod

15   Divelbiss on behalf of all of the defendants in the three

16   adversary proceedings.

17             THE COURT: All right.  Well, this is a timed

18   trial.  As I recall, we gave six hours a side, so why don't

19   we start with opening statements.  Just so you know, I've

20   read everything that you've submitted to me.

21             MR. DAVIS: Our opening statement is essentially

22   contained in our proposed findings, Your Honor, and I don't

23   feel the need to have --

24             THE COURT: All right.

25   ///
```

OPENING STATEMENT

BY MR. DIVELBISS:

Your Honor, the Defendants' position is that the evidence as assembled, or at least as proposed, and the findings are all based upon the assumption that there has been a dissolution or -- a dissolution of the partnership. Mr. Pierotti in his report or in his deposition -- and I'm sure he'll confirm today -- values the firm as a dissolution or alternatively as a going concern. There's been no attempt to do a valuation of Mr. Fotouhi's interest as a result of a disassociation. We feel therefore -- and actually we have some briefing available that Mr. Pierotti's report is inadmissible, doesn't meet the standards of <u>Delbear</u> (Phonetic).

There are also some other issues, again that we have some briefing on, for example, there's a claim that --

THE COURT: Is this briefing I haven't seen yet?

MR. DIVELBISS: Yes, Your Honor. I have a brief that I prepared; it's an evidentiary objection to Exhibits 1 and 2. The crux is certainly contained in our proposed findings and conclusions, but it's narrowed to the specific issues of the exhibits. We also have a -- we will have an objection based upon -- an objection to Exhibit 4, the opinion in the prior proceeding, and as my research indicates, there is no basis on which to introduce that

1  into evidence, other than for the fact that the decision
2  was in fact made.

3          THE COURT: Well, I think I can take judicial
4  notice of the decision, whether it's introduced or not.
5  Whether or not it has -- the real question is whether or
6  not it has any issue or claim preclusive effect, and that
7  has not been adequately addressed by either side.

8          MR. DIVELBISS: You certainly can take judicial of
9  the fact of the filing, the date, and the general nature of
10 the proceeding, but --

11         THE COURT: This will make it easier for you, Mr.
12 Divelbiss.  Unless somebody puts forth a very cogent reason
13 why Taylor versus Sturgell, S-t-u-r-g-e-l-l, 128 Supreme
14 Court 2161, U.S. Supreme Court (2008) doesn't apply here,
15 or in other words, unless you can establish -- convince me
16 that this case falls within one of the six exceptions to
17 there being a no virtual representation exception for the
18 usual rule that you have to have been a party in order for
19 collateral estoppel or res judicata to apply, I'm not going
20 to apply those doctrines, also known as issue and claim
21 preclusion, in this case.

22         MR. DIVELBISS: I agree, Your Honor, and I have a
23 brief to that effect, but I'm just --

24         THE COURT: Does it say anything about Taylor
25 versus Sturgell?

1    MR. DAVIS: For the record, I have not seen any of
2    the briefs counsel is referring to.

3    THE COURT: Well, that's probably because he
4    hasn't filed them yet, for reasons that escape me, but
5    nonetheless -- that's the case that's going to be
6    absolutely determinative.  It specifically overrules a
7    Ninth Circuit decision that deals with virtual
8    representation.  I would say that this case may be very
9    close to what the Supreme Court -- one of the Supreme
10   Court's six categories of exceptions, but this has not been
11   adequately briefed, and until it's addressed in that way,
12   I'm not willing to apply the doctrines.  So I would just
13   assume that whatever is proven in this trial is what I will
14   apply in the way of facts and law, rather than what I did
15   in the last trial.

16   MR. DIVELBISS: Okay.  That said, Your Honor, I
17   don't have anything further as an opening, and --

18   THE COURT: Well then, Mr. Davis, you can call
19   your first witness.

20   MR. DAVIS: Yes, Your Honor.  The first witness I
21   identified was Mr. Fotouhi, and he's elected not to appear
22   for trial today, so I'm going to introduce a very brief
23   deposition of Mr. Fotouhi into evidence.

24   THE COURT: All right.  Why isn't Mr. Fotouhi
25   here?  I didn't know people got to elect -- parties got to

1  elect not to appear when they've been called as a witness.

2       MR. DIVELBISS: Your Honor, Mr. Fotouhi is –- we

3  did not list him as a witness –-

4       THE COURT: Yes, but he was listed as a witness by

5  Mr. Davis, and as I just said, I didn't know that parties

6  in a piece of litigation got to decide whether to come or

7  not come, especially if they had been called as a witness

8  to the trial.

9       MR. DIVELBISS: That is –- in fact, a party is

10 obligated to appear if a subpoena has been issued and

11 served –-

12      THE COURT: Wait.  But he's not a –- he is not a

13 witness; he is a party, and I don't know that it's

14 required -- even in a deposition, I don't think you have to

15 subpoena a party to make them appear.

16      MR. DIVELBISS: That's correct, Your Honor.  In a

17 deposition you do not –-

18      THE COURT: So in a trial you do, but in a

19 deposition you don't?

20      MR. DIVELBISS: Yes, that is absolutely correct,

21 Your Honor.

22      THE COURT: Can you point me to the rule that will

23 edify me as to that?

24      MR. DIVELBISS: I'd be happy to, Your Honor.

25      THE COURT: All right.

1    MR. DIVELBISS: One moment.  I believe it's Rule
2  45, but if I could provide some more substance --
3    THE COURT: Okay.
4    MR. DIVELBISS: It's the Rutter Group, and they
5  cite <u>McGill versus Duckworth</u>, 944 F2d, 344, at 353.  They
6  also cite <u>Brockton Savings Bank</u> --
7    THE COURT: What was that last citation, please?
8    MR. DIVELBISS: I'm sorry, Your Honor, it's a
9  Seventh Circuit case, 1991, 944 F2d, 344 at 353.  There is
10 a citation to <u>Brockton</u>, B-r-o-c-k-t-o-n, <u>Savings Bank</u>
11 <u>versus Pete Marow, Mitchell & Company.</u> (Phonetic) It's a
12 First Circuit case, (1985) 771 F2d, 5.  The point cite is
13 10, and there's also a Fifth Circuit case, <u>GFI Computer</u>
14 <u>Industry, Inc. versus Frye</u>, 470 F2d, 1, point cite 5.
15 Again, it's the Fifth Circuit (1973).
16   THE COURT: Well, I'll take that under advisement.
17 Would you like to call your next witness?
18   MR. DAVIS: I'll call Mr. Pierotti, Your Honor.
19   THE COURT: All right.  Mr. Pierotti, would you
20 step forward and be sworn, please.
21  RICHARD L. PIEROTTI, JR., CPA, PLAINTIFF'S WITNESS SWORN
22   THE CLERK: Do you swear or affirm under penalty
23 of perjury that the testimony you are about to give in this
24 proceeding is the truth, the whole truth, and nothing but
25 the truth?

1          THE WITNESS: I do.

2          THE CLERK: Please state your full name for the

3   record.

4          THE WITNESS: Richard Lawrence Pierotti.

5          THE COURT: Plese be seated.

6                    DIRECT EXAMINATION

7   BY MR. DAVIS:

8   Q    State your name and address.

9   A    My name is Richard Lawrence Pierotti.  My address is

10  351 California Street, Suite 300, San Francisco.

11  Q    And what is your profession?

12  A    I'm a certified public accountant.

13  Q    And would you give me a thumbnail sketch of your

14  educational background?

15  A    I have a bachelor's degree is business with an

16  emphasis on accounting and a master's degree in business

17  with an emphasis on accounting.

18  Q    Okay.  And when did you get those degrees?

19  A    My bachelor's degree in 1982 and my master's degree in

20  1984.

21  Q    And when did you become a certified public accountant?

22  A    1986.

23  Q    And give me a sketch of your employment background.

24  A    I started working for my firm in 1984.  I became a

25  partner in the early part of 1987, and so I've been with my

1  firm for approximately 25 years.

2  Q     And what types of work do you do at the firm?

3  A     I primarily do insolvency work and also tax work.

4  Q     Have you -- in the course of your employment doing

5  insolvency work, have you had occasion to work on valuation

6  of businesses?

7  A     Yes, I have.

8  Q     And give me a brief sketch of your background in that

9  area.

10 A     I worked -- I've done valuation work on a number of

11 occasions related to transfers and purchases and sales of

12 interests in business.

13          MR. DAVIS: I move to qualify the witness as an

14 expert in the area of valuation of businesses, Your Honor.

15          MR. DIVELBISS: I have no objection, Your Honor.

16          THE COURT: He's qualified as an expert.

17 BY MR. DAVIS:

18 Q     Were you asked to prepare a valuation of the law firm

19 that's a defendant in this case, Fotouhi, Epps, Hilger and

20 Gilroy, LLP, and specifically of Mr. Fotouhi's interest?

21 A     Yes, I was.

22 Q     And do you have the exhibit book -- look at Exhibit

23 No. 1.

24 A     Yes.

25 Q     Is that a report you prepared in the course of your

1  representation of the Trustee in this case?

2  A    Yes, it is.

3  Q    First of all, give me some background about the

4  work that you did to assemble information to prepare this

5  report.

6  A    We made a preliminary request to Mr. Fotouhi, who

7  supplied us with the books and records that were used as

8  the basis for preparing the report.

9  Q    What books and records did Mr. Fotouhi supply to you?

10 A    The records he supplied were primarily Quick Book, a

11 Quick Books Data File, with accounting records, and also

12 accounts receivable records, I believe from a Time Slip

13 Software Program.

14 Q    Are any of the records that Mr. Fotouhi supplied to

15 you of the law firm attached as exhibits to your first

16 report, Exhibit 1?

17 A    Yes, they are.

18 Q    Could you tell me which ones?  Let me ask it another

19 way.  Look at Exhibit C.  Can you tell me what the source

20 of that exhibit is?

21 A    Yes, that's a balance sheet that was supplied to me by

22 Mr. Fotouhi.

23 Q    By the way, did you ever meet with Mr. Fotouhi?

24 A    Yes, I did.

25 Q    On how many occasions?

1 A    I believe on two occasions.

2 Q    And did you send him e-mails asking for documentation?

3 A    Yes, I did.

4 Q    Where did you get Exhibit D to your report?

5 A    That would have been printed from a Quick Books file

6 supplied by Mr. Fotouhi.

7 Q    And Exhibit E, where did that come from?

8 A    The --

9 Q    Oh, excuse me, this is a document you prepared; is it

10 not?

11 A    Yes, it is.

12 Q    Okay.  Take a look at Exhibit F to your report and

13 tell me what the source of that document is.

14 A    That was supplied by Mr. Fotouhi.

15 Q    What was the source of Exhibit G?

16 A    That was also supplied by Mr. Fotouhi.

17 Q    What's the source of Exhibit L, the K-1's?

18 A    Those were part of the 2004 tax -- the firm's 2004

19 tax turnovers supplied by Mr. Fotouhi.

20 Q    And if you turn to page -- the fifth or sixth page in,

21 they also include the 2005 K-1's?

22 A    Yes, they do.

23 Q    And did those come from Fotouhi as well?

24 A    Yes, they did.

25 Q    How did you go about valuing the law firm's value on

1  the date of Mr. Fotouhi's petition?

2  A    Mr. Fotouhi initially supplied a balance sheet that

3  showed a negative equity, that the firm had a negative

4  equity.  It did not include accounts receivable or work in

5  progress as of the petition date.  Subsequently he provided

6  me with the Quick Books file, so the starting point was

7  to –- I printed a balance sheet out of the Quick Books file

8  and then Mr. Fotouhi also supplied me with the accounts

9  receivable documentation and also work in process

10  documentation.  Adjustments were made to the Fotouhi Epps

11  Quick Books balance sheet, basically to develop an adjusted

12  balance sheet that was –- which the valuation was based

13  upon.

14  Q    Why was it necessary to adjust the balance sheet?

15  A    For one, they did not have the accounts receivable and

16  work in process recorded on the balance sheet that I was

17  supplied with initially.

18  Q    And those are the –- so you added adjustments to add

19  those items?

20  A    Yes, I did.

21  Q    And where did you get the information to make those

22  adjustments?

23  A    I got that information from Mr. Fotouhi.

24  Q    Did you accept Mr. Fotouhi's representations regarding

25  the accounts receivable type information?

1   A    Partially.  He supplied me with accounts receivable

2   printouts and also work in process printouts, and then he

3   had a number of proposed adjustments to those printouts,

4   and I partially accepted his adjustments.

5   Q    Walk me through where you accepted or didn't accept

6   the proposed adjustments by Mr. Fotouhi.

7   A    The adjustments are Exhibit E-1 in my report.

8   Q    Would you please walk me through those adjustments and

9   explain how they were arrived at?

10  A    Yes.  So on the top part of the page, accounts

11  receivable, the report that I was supplied with indicated a

12  value as of the petition date of 173,941, and then there

13  were -- the writeoffs that were proposed by Mr. Fotouhi, he

14  called them Client A through Client F, and he proposed --

15  on the accounts receivable, he proposed adjustments of

16  $100,182, and for the reasons listed in my notes on the

17  right-hand column, I did not agree with $58,370 of Mr.

18  Fotouhi's proposed adjustments.  So in my report, I

19  adjusted the schedule that I was provided by $41,812.

20  Q    And did you ask Mr. Fotouhi for back-up documentation

21  on any of the adjustments that he was proposing?

22  A    Yes, I did.

23  Q    And did he supply you with satisfactory documentation

24  to support his proposed adjustments?

25  A    No, he did not.

1  Q    Can you explain –- give me some specific examples.

2  A    One problem was that there were amounts that he

3  proposed writing off, but they were still –- I prepared my

4  report well over two years after the bankruptcy petition

5  was filed, and he was proposing writeoffs for amounts that

6  were –- that hadn't been written off on the firm's records

7  at that point.

8  Q    Let's get the time frame here.  The bankruptcy filing

9  is August of 2005, correct?

10 A    That's correct.

11 Q    And you were meeting with Mr. Fotouhi in what time

12 frame?

13 A    I don't recall the exact dates, but I met with him, I

14 believe it was in the spring of 2006, the first time.  And

15 then I met with him one subsequent time after that.

16 Q    And in those meetings, Mr. Fotouhi was proposing that

17 the accounts be adjusted, but they still showed up on the

18 books as being good accounts receivable?

19 A    That's correct.

20 Q    Did he supply you with any other backup for his

21 proposed adjustments?

22 A    No, he did not.

23 Q    What other types of adjustments did you make?

24 A    There was one adjustment, actually Client A.  He had

25 proposed writing off the full balance, and I, in going

1  through some of the documentation I received, I saw that

2  they received a payment post-petition on that account, so I

3  made that adjustment.  The other adjustments that I didn't

4  accept of Mr. Fotouhi's were primarily because there was no

5  substantiation.

6  Q    Can you tell me what adjustments Mr. Fotouhi was

7  proposing for which he had no substantiation?

8  A    That would have been the adjustments for Clients B

9  through F.

10        THE COURT: Which exhibit are you referring to?

11  Is that represented on an Exhibit, B through F?  I'm

12  looking at E, and I'm looking at E-1.  Is there some other

13  exhibit I should be looking at to see those clients you're

14  referring to?

15        THE WITNESS: Yes.  It would be Exhibit F, Your

16  Honor.

17        THE COURT: F.  All right.  And the letters you're

18  referring to are those represented by letters that are on

19  the furthest left-hand side of the page, such as --

20        THE WITNESS: That's correct, Your Honor.

21        THE COURT: Page 1 has an "A" next to $44,303.43?

22        THE WITNESS: That's correct, Your Honor.

23        THE COURT: All right.  Thank you.

24  BY MR. DAVIS:

25  Q    Just to be clear, it's Exhibit E –- the second page of

1  Exhibit E summarizes the adjustments that were made as to

2  the clients identified by a letter, correct?

3  A    That's correct.

4  Q    So for example, where it says "Client B, there's a,

5  per Shahab Fotoui twenty-two hundred eleven dollar number.

6  Do you see that?

7  A    Yes.

8  Q    And then you made an adjustment knocking that out,

9  correct?

10 A    That's correct.

11 Q    And what you're saying is Exhibit F is backup supplied

12 by Mr. Fotouhi to support those line items.

13 A    That's correct.

14 Q    Did you reach a conclusion -- leaving aside the issue

15 of what percentage Mr. Fotouhi owned in the partnership --

16 did you reach a conclusion as to the value of the

17 partnership shares in total as of the date of Mr. Fotouhi's

18 bankruptcy?

19 A    Yes, I did.

20 Q    And can you tell me what that conclusion about it was?

21 A    In my initial report, I concluded that the value as of

22 the petition date was $492,215.

23 Q    As of the date of your initial report, had Mr. Fotouhi

24 yet supplied you with the records relating to ongoing work

25 that was at the firm on the date of bankruptcy?

1  A    No, he had not.

2  Q    And that's -- when you say you didn't include that,

3  that's because you got that information later?

4  A    That's correct.

5  Q    Okay.  And that's included in your second report?

6  A    Yes, that's correct.

7  Q    So your first report doesn't attempt to value that

8  asset; does it?

9  A    No, it does not.

10  Q    In addition to reaching a conclusion as to the value

11  of the partnership interest, the equity, did you -- were

12  you asked to reach a conclusion as to Mr. Fotouhi's

13  percentage ownership?

14  A    Yes, I was.

15  Q    Take a look at Exhibit 5, Fotouhi Epps Partnership

16  Agreement?  Were you shown the Partnership Agreement for

17  the law firm?

18  A    Yes, I was.

19  Q    And does the Partnership Agreement define the interest

20  of various partners?

21  A    No, it does not.

22  Q    Other than the K-1's that were issued by the

23  partnership, were you ever shown any evidence that

24  established what the percentage interests were?

25  A    No, I was not.

1  Q    Did you talk to Mr. Fotouhi about that?

2  A    Yes, I did.

3  Q    Did he say there was some agreement or writing

4  anywhere that would define that?

5  A    He didn't tell me that there was any written document

6  that would define it.

7  Q    How did you go about determining what Mr. Fotouhi's

8  interest in the partnership was?

9  A    What I did was I looked -- there were a number of

10  items that were shown as firm expenses that appeared to be

11  for Mr. Fotouhi's personal benefit.  So what I did was I

12  took the allocation of the income, and I made adjustments

13  to add those specific items -- to treat them as a

14  distribution to Mr. Fotouhi.

15  Q    First of all, did you look at the -- the 2004 K-1 for

16  Mr. Fotouhi was the last tax return for the partnership

17  filed by the partnership before Fotouhi filed bankruptcy,

18  correct?

19  A    That's correct.

20  Q    And that showed Mr. Fotouhi owning 35.8 percent of the

21  partnership?

22  A    That's correct.

23  Q    And you made adjustments that increased that a small

24  amount; did you not?

25  A    Yes, I did.

1  Q    And those adjustments were based upon reviewing the

2  amount that the partners drew and the expenses paid?

3  A    Yes.

4  Q    And how did -- can you just walk be through how you

5  arrived at the 38.59 percent?

6  A    The method I used to calculate the percentages are

7  actually included in Exhibit J.  It started off with the

8  income as it was allocated for the year 2004.  I started

9  with the income that was allocated per the K-1's from the

10 partnership income tax return.  And then I made certain

11 adjustments to those income allocations that are on the

12 form there.  The one was related to the litigation with Mr.

13 Fotouhi's -- expenses that were paid related to the

14 litigation with Mr. Fotouhi's former firm.  Those expenses

15 were actually taken as a -- on the income statement that I

16 was provided, they were shown as a firm expense.  So what I

17 did was I reallocated those expenses to Mr. Fotouhi himself

18 and reduced the amounts to the other partners.  The firm

19 was also paying Mr. Fotouhi's personal automobile expenses.

20 I took the same approach there and reallocated those

21 expenses to Mr. Fotouhi.

22          In doing that, I came up with a pro forma amount

23 of income which basically represented the income that was

24 originally allocated to Mr. Fotouhi, plus these other items

25 that appeared to be for Mr. Fotouhi's benefit, to come up

1  with an actual income allocation.

2  Q    When you refer to litigation expenses paid on behalf

3  of Mr. Fotouhi, what litigation are you referring to?

4  A    It was the -- they were identified as PCF, I believe

5  it's a PCF legal expense -- or I'm sorry, PSF legal

6  expense, which my understanding was that that was the -- those

7  are costs related to litigation with Mr. Fotouhi's former

8  firm.

9  Q    And was it your understanding that the other partners

10 in Fotouhi Epps were partners to that litigation?

11 A    It was my understanding they were not.

12 Q    So that's why you allocated it to Mr. Fotouhi because

13 he was the only partner that was a defendant in that

14 litigation?

15 A    That's correct.

16 Q    And with respect to the personal automobile, weren't

17 there automobile expenses -- or leases paid for by the firm

18 for the other partners?

19 A    Not that I'm aware of.

20 Q    So it was only Mr. Fotouhi that had a car paid for by

21 the partnership?

22 A    That's -- to the best of my knowledge, that's correct.

23 Q    Now in your Exhibit J, you come up with 41.74 percent

24 for Mr. Fotouhi after adjustments to 2004, correct?

25 A    That's correct.

1   Q   And 37.52 after adjustments for 2005?

2   A   That's correct.

3   Q   Can you tell me how you came up with your number of

4   38.59 using those two calculations.

5   A   The 38.59 would be a combination of the two years 2004

6   and 2005, so it would be based on the pro forma income for

7   each one of the partners. It's just basically a percentage

8   of the total. Mr. Fotouhi's pro forma income was $444,998,

9   and taking that as a percentage of the total pro forma

10   income for the firm, his percentage would be 38.59 percent.

11         MR. DAVIS: I'd move Exhibit 1 into evidence, Your

12   Honor.

13         MR. DIVELBISS: Your Honor, I object to Exhibit 1

14   on this ground. The law is clear that a valuation needs to

15   be done on either a liquidation value or on the value of

16   the firm going forward without Mr. Fotouhi. The report

17   purports to be a valuation on the firm based upon it going

18   forward with Mr. Fotouhi as a going concern, and that is

19   improper under <u>Delbear.</u> The whole report then is based --

20         THE COURT: <u>Delbear</u> doesn't have anything to do

21   with this. <u>Delbear</u> has to do with scientific evidence and

22   whether or not it's valid or it isn't valid.

23         MR. DIVELBISS: Well, it also has to do with

24   improper assumptions, Your Honor, and it's based upon --

25         THE COURT: Yes, but it doesn't say what you just

1   said it says.  It doesn't have anything to do with

2   valuation, and it doesn't have anything -- it does have to

3   do with non-science, if you will.  But it doesn't have

4   anything to do with valuation, and it doesn't set any

5   precepts clear or otherwise as to how you value something.

6   So I don't think it stands -- it's a useful case in certain

7   circumstances, but not here.

8           MR. DIVELBISS: We'd also cite to the <u>McCliche</u>

9   (Phonetic) case.  It's a Ninth Circuit --

10          THE COURT: Is there some reason why you didn't

11  prepare this in your proposed findings since you obviously

12  have had plenty of time to realize you were going to object

13  to this exhibit.  It's really very difficult to try to do

14  the research that you're now quoting to me as you're making

15  your objection.

16          MR. DIVELBISS: Well, Your Honor, the findings do

17  reflect the fact that the appropriate measure of -- the

18  appropriate method to value under Section 16601 of the

19  California Corporations Code is by either the value of the

20  firm going forward without Mr. Fotouhi or a liquidation

21  value.  That is in there --

22          THE COURT: Well, let me ask -- let me do a little

23  voir dire of the witness here.

24              <u>VOIR DIRE EXAMINATION BY THE COURT:</u>

25  BY THE COURT:

1  Q     What does this valuation that you've given me in

2  Exhibit 1 represent?  Does it represent a liquidation

3  value, a going-concern value, something in-between, or none

4  of the above.

5  A     It would be more along the line -- it does not

6  represent a liquidation value.

7  Q     All right.

8  A     It would be a going-concern value without good will

9  considered.

10  Q     So what if I were just to take the work in progress,

11  the accounts receivable and the cash, would that number be

12  different, significantly different, than the number you've

13  come up with in terms of the value of the firm as of the

14  date of the filing of the bankruptcy petition?

15  A     Those would definitely be the primary factors, less

16  whatever liabilities there were as of the petition date for

17  the firm.

18  Q     So why is it that now that we've established what the

19  work in progress was and so forth, as of the date of the

20  filing of the petition, why shouldn't I do that?

21          MR. DAVIS: I'm not quite sure what you're asking,

22  Your Honor.

23          THE COURT: Well, what I'm trying to figure out

24  is, it seems to me you can't have it both ways, Mr. Davis.

25  As I understand it, you're taking the position that this

1  partnership was effectively dissolved as of the date Mr.

2  Fotouhi filed his bankruptcy petition because that's what

3  California law says.

4          MR. DAVIS: No, that's not my position.

5          THE COURT: Well, you know what, that seems to be

6  what the statute says.

7          MR. DAVIS: My position is that we get the higher

8  of the liquidation or the going-concern value.

9          THE COURT: Why is it -- tell me where I can find

10  that in the California statute.

11          MR. DAVIS: Corporations Code 16701.

12          THE COURT: 701, okay.  And it's paragraph --

13          MR. DAVIS: (b).

14          THE COURT: (b).  You know I read this after I

15  read your brief, and I don't understand what it says

16  exactly.  I don't understand the last part.  It says:

17          "... based on a sale of the entire business as a

18          going concern without the disassociated partner,

19          and the partnership was wound up as of that

20          date."

21  Does that mean that you are not to consider the -- the

22  going-concern value without the disassociated partner.  I'm

23  not sure how you do that.

24          MR. DAVIS: Well, in this case, obviously, we have

25  the fiction of somebody being in bankruptcy and there's a

1  post-petition Fotouhi and a pre-petition Fotouhi.

2  THE COURT: That's right.

3  MR. DAVIS: The disassociated partner is

4  essentially the estate's interest, the pre-petition

5  Fotouhi. The pre-petition Fotouhi is not going forward;

6  he's not working anymore. But the post-petition Fotouhi

7  never missed a beat. He continued to work with the firm.

8  THE COURT: Right.

9  MR. DAVIS: So we're valuing the firm without the

10 pre-petition Fotouhi, who is the disassociated partner.

11 They essentially just rent, and without any formalities,

12 started up a new partnership.

13 THE COURT: The way you do that is, you just

14 simply –- the only thing that would not be included for

15 that purpose would be the good will. Is that what you're

16 saying?

17 MR. DAVIS: Yes.

18 THE COURT: Because the pre-petition Fotouhi –-

19 the pre-petition Fotouhi's work in progress and the pre-

20 petition Fotouhi's accounts receivable would be included in

21 either a liquidation or going-concern valuation?

22 MR. DAVIS: Yes.

23 THE COURT: Okay. And why do you think that's

24 wrong?

25 MR. DIVELBISS: Your Honor, the Code is –- I think

1  it's clear -- this is not a dissolution.  A dissolution is
2  different than a disassociation.  This is a disassociation.
3  The Code is absolutely clear that upon his filing under
4  Section 16601, Mr. Fotouhi becomes a disassociated partner,
5  and then 16701 combined with 16807 say, okay, how do we
6  value the disassociated partner's interest.  It's the
7  greater of the liquidation value or the value of the firm
8  going forward without that person.  Now, if you look at a
9  firm, say like Brobeck, and Joe Schmoe disassociates, the
10 value of Brobeck -- and maybe I shouldn't use Brobeck
11 because of their situation now; let's use Morrison and
12 Foerster -- one attorney leaves; the value of that firm
13 going forward without that person is basically the same or
14 generally maybe slightly different than whether it's with
15 or without him.

16        But in Mr. Fotouhi's situation, and everybody
17 here has acknowledged, and Mr. Pierotti acknowledged that
18 you can't -- you either can't value it going forward
19 without Mr. Fotouhi or the value is virtually zero, because
20 Mr. Fotouhi brought in most of the work.  So then the only
21 other value that could be used is liquidation value.  The
22 only appropriate method to value the disassociated
23 partner's interest in this situation is a liquidation
24 value.  Mr. Pierotti has indicated his report is not a
25 liquidation value.  Therefore, that's the basis for our

1  objection. That's the reason why it is inadmissible. It's

2  based upon an improper assumption because he valued it as a

3  going concern with Mr. Fotouhi, directly contrary to 16701.

4  BY THE COURT:

5  Q    Did you value this as a going concern?

6  A    Essentially I valued it as a going concern without any

7  consideration for good will.

8  Q    Well, how can you do that based upon the fact that you

9  have to disassociate Mr. Fotouhi from the going-concern

10 value post-petition?

11 A    My understanding when I prepared the report was that

12 the -- essentially the bankruptcy estate was the

13 disassociated partner, and I prepared my report well over

14 two years after Mr. Fotouhi's petition was filed, and there

15 essentially was no -- based on my understanding, there was

16 no interruption of the firm's business. So I was --

17         THE COURT: Yeah, but that -- you know, gentlemen,

18 I think we have to split this thing into two parts. The

19 first part is, what was Mr. Fotouhi's partnership interest

20 worth based upon all the evidence as of the date he filed

21 the bankruptcy, number one. And number two, we then have

22 to determine what were his post-petition earnings based

23 upon the standard under 541(a)(6) of the Bankruptcy Code.

24 And those are two separate issues, I believe, that have to

25 be considered separately.

1          MR. DAVIS: I think the post-petition earnings

2   issue is an affirmative defense.  I don't think it's part

3   of this valuation --

4          THE COURT: That's true, and I've held that.

5          MR. DAVIS: And they haven't -- they elected not

6   to call any witnesses on the issue, so it's an affirmative

7   defense they're not offering any evidence on, so I don't

8   think --

9          THE COURT: They also haven't pled it because

10  there's never been an amended answer filed.  And that

11  brings me to another point that I want to make clear for

12  the record, if nothing else.  In reviewing the docket

13  sheets once again this morning in these adversary

14  proceedings, I notice that there was a motion for

15  reconsideration of an order, amended order, that I put on

16  in this case on April the 3rd, I believe it was April the

17  3rd.  And the order states, to paraphrase, that the

18  Defendant may amend his answer or their answer, the

19  Defendants may amend their answer if, and only if, they

20  provide the post-petition ledgers for Fotouhi, Epps,

21  Hilger, et cetera, Fotouhi, Epps, Filger and Gilroy.

22          Several days after that, there was a motion for

23  reconsideration of that order which essentially sought

24  clarification that the Court was merely requiring that

25  ledgers as to Mr. Fotouhi only were required to be turned

1 over. Well, the order simply doesn't say that, for one

2 thing, nor was it my intention that it say that. But

3 secondly, there was never a request for a hearing on that

4 motion, and there was never an order uploaded so that the

5 matter would be brought to the Court's attention such that

6 we would know that we were supposed to do something with

7 that motion. So as far as I'm concerned, the motion was

8 never properly brought before the Court. But secondly,

9 even it had been properly brought before the Court, the

10 motion would have been denied, because I think the order

11 was quite clear that the post-petition ledger of the entire

12 law firm had to be presented as a condition to the Court

13 allowing the Defendants to amend their answer. And so the

14 Court is now holding that the answer may not be amended.

15 MR. DIVELBISS: Well, Your Honor, can I respond to

16 that, please. First of all, we did provide Mr. Fotouhi for

17 a deposition. We also provided, what we call the limited

18 ledger that we thought was the appropriate portion in terms

19 of the defense, and then it's my understanding my associate

20 had presented the ex parte application appropriately.

21 Apparently that's not the case. But we --

22 THE COURT: You can't do an ex parte application.

23 MR. DIVELBISS: We then -- we did provide the full

24 ledgers in advance of Mr. Fotouhi's deposition.

25 THE COURT: Is that correct?

1          MR. DAVIS: Yes.

2          THE COURT: Is there some reason then why I

3  shouldn't allow him to amend his answer.

4          MR. DAVIS: I don't object to him amending his

5  answer.  I don't know why he didn't file the amended

6  answer.  I'm only saying that at trial they haven't

7  introduced any evidence or witnesses --

8          THE COURT: Fine.  But let's deal with this issue

9  first.

10          MR. DAVIS: That's fine.  That's fine.  I have no

11  objection to --

12          THE COURT: You may file an amended answer.  I

13  don't know you haven't attempted to do so before now, but I

14  will allow you to file an amended answer that raises the

15  541(a)(6) defense.

16          MR. DIVELBISS: Thank you, Your Honor.

17          THE COURT: Now, as to whether or not they've got

18  any evidence in support of the affirmative defense, I guess

19  time will tell.  So here is my ruling on the objection to

20  Mr. Peirotti's report.  To the extent that it represents --

21  and I believe the numbers are there to allow it to

22  represent -- a valuation of the firm as of the date of the

23  filing of the petition based upon accounts receivable, work

24  in progress, and cash in the firm, it's admitted.  To the

25  extent that it attempts to represent that there was

1  additional value from the disassociated partner, whether

2  it's the estate or Mr. Fotouhi; I don't think it makes any

3  difference, then I will not accept it.  But I do believe

4  that it provides valuable information as to what the firm

5  was worth as of the date of the filing of the petition.

6  And that's my ruling.

7          MR. DAVIS: Thank you.

8                          (Whereupon, Plaintiff's Exhibit 1,

9                          Mr. Pierotti's initial report, is

10                         admitted into evidence.)

11              DIRECT EXAMINATION (CONTINUED)

12  BY MR. DAVIS:

13  Q    Mr. Pierotti, a couple of follow-up questions, with

14  respect to Exhibit 1 only or your first report, what would

15  be the difference between a liquidation analysis and a

16  going-concern analysis on the facts that you were presented

17  with?

18          MR. DIVELBISS: Your Honor, I'd object --

19          THE COURT: Overruled.

20          THE WITNESS: There would be adjustments.  My

21  report as I stated earlier is not a liquidation analysis.

22  With a liquidation analysis, you would have to take in

23  factors related to expenses to wind down a firm.  You would

24  also have to consider -- a large consideration would be

25  whether or not you would be able to collect your

1   receivables and work in process, if clients -- if you're

2   out of business, you know, would they pay the billed fees.

3   BY MR. DAVIS:

4   Q     And can you explain to me why you did not incorporate

5   adjustment for wind-down expenses and collecting accounts

6   receivable?

7   A     Again, I prepared my report well over two years after

8   the bankruptcy petition was filed and so I was preparing it

9   based on a going-concern value.

10  Q     When you say -- what's the significance of the fact

11  that you were preparing the report two years after the

12  valuation date?

13  A     Well, at that point, I could see that Mr. Fotouhi

14  remained with the firm, and the firm basically operated --

15  it appeared to me that it operated on the same basis pre

16  and post-bankruptcy filing of Mr. Fotouhi.

17  Q     Did Mr. Fotouhi in fact provide you with any evidence

18  that there were any wind-down expenses?

19  A     No, he did not.

20  Q     Did he provide you with any evidence that there were

21  expenses associated with collecting the accounts

22  receivable?

23  A     Not specifically with collecting, other than the

24  firm's general overhead administrative expenses.

25  Q     And those were incorporated already into your report;

1  were they not?

2  A    Yes, they were.

3  Q    Would you turn to Exhibit 2.  Is Exhibit 2 a

4  subsequent report you prepared?

5  A    Yes, it is.

6  Q    And it was prepared based upon what additional

7  evidence?

8  A    It was prepared based on the Jewel versus Boxer case.

9  It was primarily related to determining what post-

10  petition -- post bankruptcy petition -- collections there

11  were related to clients as of the petition date, taking

12  into account an administrative overhead expense applied to

13  those collections.

14  Q    So that the record is clear by what you mean by Jewel

15  versus Boxer, first of all, tell me what the data was that

16  you considered in preparing Exhibit 2.

17  A    The data that I considered would have been the

18  collections on work in process as of the petition date, and

19  additional work that was performed for the clients of the

20  firm that were clients as of the petition date.

21  Q    And that's data that you didn't have at the time of

22  your first report?

23  A    That's correct.

24  Q    And is that data contained somewhere within your

25  report?

1  A    Yes, it is.

2  Q    Tell me which exhibit of your report that is contained

3  in.

4  A    It would be in more than one place, but Exhibit A-4 is

5  information regarding their clients –- regarding the firm's

6  clients from September 1st, 2005 up until the date the

7  report was printed in October 2008.  There's additional

8  information in Exhibit A-5.  And then the other exhibits,

9  we took the information that was supplied by Mr. Fotouhi.

10 What we did was we compared it –- the work in process that

11 was included in the initial report, and that would have

12 already been included in the initial valuation, so what we

13 did was we tried to say what additional collections there

14 were above what we included in work in process in the

15 initial report.

16 Q    So you're saying you made adjustments to make sure

17 there wasn't any double counting?

18 A    That's correct.

19 Q    Okay.  And what –- and first of all, A-4, this is the

20 work product of the law firm, not your accounting firm,

21 correct?

22 A    That's correct.

23 Q    Okay.  And then walk me through this, the exhibits to

24 your second report, and tell me what these are.

25 A    Exhibit A-1 is basically a recap, a recap of the

1  following schedules.  It indicates the number that we

2  arrived at for the post-petition legal fees collected for

3  post-petition services, as it relates to clients as of the

4  petition date.  That's the $2,315,813 number, and then we

5  calculated a reasonable overhead percentage to apply to the

6  collections.  That number is 56.33 percent.  And then we

7  basically subtracted that number from the collections to

8  come up with the net number of $1,011,315.

9  Q    What does that number stand for?

10 A    That would be the post-petition collections from firm

11 clients as of the petition date, less a reasonable overhead

12 percentage applied to the collection of those fees.

13 Q    And then did you arrive at a valuation of what Mr.

14 Fotouhi's interest in that asset of the law firm was?

15 A    That would have been the amount included in the

16 initial report.

17 Q    You mean the percentage from the initial report?

18 A    Yes.

19 Q    So you applied the same percentage in both reports for

20 Fotouhi's interest?

21 A    Yes.  I did not -- we did not -- in the supplemental

22 or second report, we did not make an adjustment to Mr.

23 Fotouhi's percentage.

24 Q    Can you walk me through Exhibit A-3 to your second

25 report and explain what this is.

1  A    This is a –- again, this is the balance sheet, and

2  basically this is what we looked through –- this would be

3  the same as what was in the initial report.  The bottom

4  line is it comes down that the firm's equity –- let me

5  see –- it's basically a valuation as of August 29th showing

6  the firm's equity at $404,000.

7  Q    And can you tell me what Exhibit A-6 to your report

8  is?

9  A    A-6 is the work in process that was written off in the

10 original report.  We're making an adjustment –- it's

11 related actually to a previous schedule, but what we were

12 doing is we were trying to identify the costs that were

13 included in the work in process.

14         MR. DAVIS: I move Exhibit 2 into evidence, Your

15 Honor.

16         MR. DIVELBISS: Your Honor, I object on the ground

17 that again it's based upon improper assumptions.  It also

18 violates 541(a)(6).  It violates the revised Uniform

19 Partnership Act by not considering reasonable expenses and

20 reasonable salaries of the operating partner, and therefore

21 I believe it's inadmissible.

22         THE COURT: Well, just so we have clarification,

23 you stated in your proposed findings and conclusions that

24 Jewel v. Boxer is no longer good law.  That proposition is

25 rejected.  Notwithstanding the changes to the Uniform

1    Partnership Act that you cite, the courts of California

2    have consistently and repeatedly continued to apply <u>Jewel</u>

3    even after those changes.  I cite to you, for example --

4    and this is just one example -- there's a case that's even

5    more recent from 2008, and this is <u>Rothman versus Dolan</u>

6    (Phonetic) 20 Cal.Ap 4th, 755; 24 Cal Reporter 2nd, 571, in

7    which the court cites with approval and follows the <u>Jewel</u>

8    <u>v. Boxer</u> case, and of course that was seven years after the

9    1984 amendment -- excuse me -- it was nine years after the

10   1984 amendments that you refer to as changing the holding

11   in <u>Jewel</u>.

12        Secondly, this is extremely problematic.  The

13   books and records were not turned over in a timely way as I

14   recall in this case, the partnership records, nor was the

15   partnership interest itself.  If this was -- if as the

16   Uniform Partnership Act says, there was supposed to be

17   basically a cessation of the partnership as of the date of

18   the bankruptcy because it is essentially dissolved as of

19   that date as an act of default, if you will, under the

20   appropriate section.  I think it's what you've cited as

21   Section 16601.  Then at that point in time, everyone in the

22   firm should have ceased doing whatever it is that they were

23   doing.  Instead they acted like nothing had ever happened.

24   They just continued to operate the place without missing a

25   beat and acted as though they still owned everything,

1  including what then, at that point, was property of the

2  estate, that being Mr. Fotouhi's interest in the

3  partnership.

4        So to the extent that it has become very

5  difficult to figure out how much time was spent on winding

6  this down, what the overhead should be, and so forth, I

7  think all of the -- as a matter of equity, and <u>Jewel v.</u>

8  <u>Boxer</u> does rely strongly upon equitable principles -- I

9  think the presumption ought to be totally against the

10 partners and Mr. Fotouhi.

11       MR. DIVELBISS: Your Honor, as far as I know,

12 there's been no delay in turning over any documents.

13       THE COURT: That's not my recollection.

14       MR. DIVELBISS: I was not involved in the prior

15 case, but not in this case, there was not.  Then with

16 respect to --

17       THE COURT: Maybe not since you've been involved,

18 but there was, and as recently as just a few weeks ago, a

19 problem with turning over the post-petition ledgers of the

20 firm, or else I missed something.

21       MR. DIVELBISS: That was the first time they had

22 ever been requested.

23       THE COURT: Of you.

24       MR. DIVELBISS: Okay.  And they were turned over

25 promptly.

1           THE COURT: By you.

2           MR. DIVELBISS: Yes.

3           THE COURT:  That's right.  But I have a strong

4    recollection that we have had nothing but problems,

5    discovery problems, and we've had nothing but resistance

6    from prior counsel and Mr. Fotouhi to turning over the

7    documents that would have given everybody the information

8    they needed to determine what the wind-down ought to be, or

9    what wind-down expenses there ought to be, including how

10   much money should be allocated to the time spent by the

11   partners in winding down the affairs of the firm.

12          MR. DAVIS: The documents which are the basis of

13   Exhibit 2 weren't turned over promptly.  We prepared a

14   motion to compel, and only upon that threat of filing a

15   motion to compel did Mr. Divelbiss turn these records over.

16   And that was discussed at a status conference.

17          THE COURT: In any event, look -- so I would

18   agree, because it appears as though -- and Mr. Davis, isn't

19   it true that Jewel v. Boxer does contemplate that there be

20   overhead calculated, which I think Mr. Pierotti's report

21   does do, there is an overhead included, but aren't they

22   entitled also to whatever effort it took to wind this down

23   and the hours spent winding it down as a part of the

24   calculation?

25          MR. DAVIS: Yes, but they didn't provide us with

1  that information, and one of the reasons I've offered Mr.

2  Fotouhi's deposition, even when we attempted to find out

3  what his salary was or what his earning was, he was so

4  evasive, it's impossible to figure anything out.  And the

5  burden should be shifted to them to show that there should

6  be some offsets for the efforts that were expended in

7  collecting these accounts.

8         THE COURT: I agree.

9         MR. DIVELBISS: Your Honor, first of all, let me

10 respond to the statement about a motion to compel.  First

11 of all, there was never a request, a formal request for

12 documents.  There was an oral request for documents, and

13 they were provided.  The suggestion that Mr. Davis had to

14 threaten a motion to compel is absolutely incorrect.  There

15 was never a formal request for documents.  Nonetheless,

16 these documents were provided.  Secondly --

17        THE COURT: When?

18        MR. DIVELBISS: Months and months ago, last fall.

19 Months and months ago, Your Honor.

20        THE COURT: Were there documents provided that

21 would have allowed Mr. Pierotti or anyone else for that

22 matter to determine how much time was spent to wind down

23 the accounts and work in progress that were in existence as

24 of the date of the bankruptcy, and were there documents

25 presented that would have allowed someone to determine what

1  percentage of the case was completed as of the date of the

2  bankruptcy in keeping -- assuming that 541(a)(6) has

3  applicability here -- with the holding in In re Jess, 169

4  F3d, 1204, 9th Circuit (1999), which granted involved a

5  contingent fee case or cases, but nonetheless said, you

6  have to figure out what percentage of the case is completed

7  as of the date of the filing of the petition.  Were there

8  documents of that nature presented?

9      MR. DIVELBISS: Yes, Your Honor.  The Time Slips

10 documentation that Mr. Pierotti referred to references the

11 various clients and they are apparently matched so that

12 information could have been --

13     THE COURT: Time Slips.  What exhibit are you

14 referring to?

15     MR. DIVELBISS: I believe the A-3 is a --

16     THE COURT: A-3 doesn't do it.  That's just a

17 balance sheet.  I don't think I've ever seen any time

18 sheets from Fotouhi Epps.

19     MR. DIVELBISS: I do recall Mr. Pierotti indicated

20 that the documents that we was provided were Quick Books

21 and then some time --

22     THE COURT: Were you presented with time records?

23     THE WITNESS: No, I was not, Your Honor.  I

24 believe there was one exception.  There were two relatively

25 small contingency cases, ongoing as of the petition date,

1   and I believe that for those two cases, I did receive time

2   records, and I prepared -- I basically allocated those fees

3   based on the number of hours that were pre-petition and the

4   number of hours that were post-petition.  But for other

5   clients, I did not see time records.

6           THE COURT: Okay.

7           MR. DAVIS: One other clarification, Your Honor.

8   Mr. Divelbiss' memory is a little wrong on this.  I'm

9   looking at my e-mail exchange with Mr. Divelbiss on October

10  21.  Mr. Divelbiss writes --

11          THE COURT: Of what year?

12          MR. DAVIS: 2008.  "Dennis, hold off on your

13              motion.  I believe I have convinced my client to

14              produce the documents."

15  It was on October 27, 2008 that these documents that are

16  part of Exhibit 2 were finally turned over.  So to say he

17  had never heard about a motion is -- I'm sure he's

18  forgotten about that.

19          MR. DIVELBISS: I don't dispute that that e-mail

20  existed.  What happened, there was no request, no formal

21  request, for documents that was ever made.  There was an

22  oral request.  The oral request was complied with last

23  fall, as confirmed by Mr. Davis.

24          THE COURT: Well, there are no time sheets.  I'm

25  not going to include -- he has included an overhead amount.

1  There are no time sheets that are available.  He has taken
2  an allocation for the two small contingent fee matters that
3  were involved, and so to get back to the original point of
4  all of this, there was an objection to Exhibit 2.  The
5  objection is overruled.  Even though it does not -- the
6  report does not include time sheets that would allow us to
7  see how much time was spent winding down the affairs of the
8  estate and getting credit for that, I find that that
9  information was not provided to Mr. Pierotti and therefore
10 he couldn't make that calculation and I believe it is the
11 burden of the Defendants to now go forward and show us how
12 much that should be.  So the objection is overruled.  I'm
13 accepting the report as it is.

14         MR. DIVELBISS: Could I make two points, Your
15 Honor.  First of all, that information was never requested.
16 Number two --

17         THE COURT: I'm not going to get into that.

18         MR. DIVELBISS: Number two, the basis -- the basis
19 for the objection is that this needs to be valued as a
20 disassociated partnership, period.  And the fact that money
21 was made post-petition, is --

22         THE COURT: You didn't act like -- you know, the
23 Uniform Partnership Act also requires that there be an
24 offer made to settle up the affairs of the partnership;
25 doesn't it?  And that offer was never made by anybody; was

1  it?

2          MR. DIVELBISS: Yes, it has been, Your Honor.

3          THE COURT: Do you have it in writing?

4          MR. DIVELBISS: There have been multiple

5  settlement offers, Your Honor.

6          THE COURT: That's not what I'm talking about.

7  I'm talking about what the Uniform Partnership Act

8  requires.  That kind of an offer was never made; was it?

9          MR. DIVELBISS: The Uniform Partnership Act

10 indicates that if a disassociated partner wants an

11 accounting, they are to provide notice.  The notice was

12 never provided.  There was never any indication that the

13 Plaintiffs were seeking any kind of an accounting as a

14 disassociated partner.  They were always asking as if the

15 firm had been dissolved.

16         MR. DAVIS: There's no notice provision in 16701,

17 Your Honor.

18         THE COURT: No, there isn't.

19         MR. DIVELBISS: Yes, there is a notice provision.

20         THE COURT: Tell me where it is.  I'm looking at

21 it.

22         MR. DIVELBISS: It's under 16701(i).  It provides

23 a time period within which --

24         THE COURT: That's when the disassociated partner

25 may maintain an action against the partnership.

1          MR. DIVELBISS: That's correct, Your Honor.

2          THE COURT: But by its terms, (a) and (b) and

3     (c) -- well, actually (a) and (b) and (e) all contemplate

4     that the partnership shall make a buyout of the partner,

5     the disassociated partner, and if there's no agreement for

6     the purchase of the disassociated partner's interest within

7     120 days after a written demand for payment, the

8     partnership shall pay or cause to be paid in cash the

9     amount the partnership estimates, et cetera, and so forth.

10          As I said, and I don't think there was really

11    any dispute about it, this partnership continued to act as

12    though nothing had ever happened after Mr. Fotouhi filed

13    bankruptcy.  It continued to operate the way it had always

14    operated under terms which were never spelled out in

15    writing, and so that complicates this whole issue

16    enormously.  Don't you think?

17          MR. DIVELBISS: Actually it does not, Your Honor.

18          THE COURT: It doesn't?

19          MR. DIVELBISS: No, it does not, Your Honor,

20    because what it says is that this is not a dissolution

21    situation.  It's a disassociation.  And the way you value a

22    disassociated partner's interest is a liquidation value.

23    That can be done, has been done, by our expert, was done in

24    the prior proceeding.  It was just determined in this

25    proceeding not to be done that way.  The appropriate method

1  to value the interest that the Plaintiff is entitled to is
2  by a liquidation value.  We did that.  We have offered that
3  amount of money and more to resolve the matter.
4          THE COURT: Here's what 16701 says, (e) says
5  again.
6          "The partnership shall pay or cause to be paid in
7          cash to the disassociated partner the amount the
8          partnership estimates to be the buyout price and
9          accrued interest, reduced by any offsets and
10         accrued interest under subdivision (c)."
11  That sounds to me like a liquidation.  It sounds to me like
12  exactly what he did.  Your objection is still overruled.
13  Exhibit 2 is admitted.
14                          (Whereupon, Plaintiff's Exhibit 2,
15                          Mr. Pierotti's second report, is
16                          admitted into evidence)
17  You may continue your questioning if you'd like.
18          MR. DAVIS: I'm finished with the witness, Your
19  Honor.
20          THE COURT: All right.  Then you may cross-
21  examine.
22          MR. DIVELBISS: Your Honor, could I get five
23  minutes to go to the restroom?
24          THE COURT: Yes.  We'll stand in recess for 15
25  minutes.  And by the way, a whole stack of unmarked

1  material has been dropped off in my chambers.  I have no

2  idea what it is and I have no idea who wanted it, but there

3  it is.  You can have it.  We'll stand in recess.

4          MR. DIVELBISS: Thank you.

5      (Whereupon, a recess is taken from 10:44 a.m. to 11:59

6  a.m.)

7          THE COURT: All right.  Would you like to cross-

8  examine?

9          MR. DIVELBISS: Thank you, Your Honor.

10                  CROSS-EXAMINATION

11  BY MR. DIVELBISS:

12  Q    Good morning, Mr. Pierotti.  How are you?

13  A    Good morning.

14  Q    I'd like to first direct your attention to Exhibit 1,

15  which is your -- I'll refer to it as your initial report.

16  A    Yes.

17  Q    Okay.  And in consideration of that initial report and

18  your Exhibit B, you indicate that you reviewed a report

19  from a Mr. Jay Crom.

20  A    Yes, that's correct.

21  Q    And you also recall reviewing a report from a Mr.

22  Tregellis.

23  A    I believe I did also review Mr. Tregellis' report.

24  Q    And you also recall reviewing a report from Charles

25  Mahta.

1  A    Yes, I have.

2  Q    In each of those three reports, there was a

3  consideration, was there not, of -- let me rephrase that.

4  In each of those three reports, there was a consideration

5  of wind-down costs for the partnership entity when they

6  were attempting to value it as of the petition date, right?

7  A    I would have to review the reports again.  I know in

8  Mr. Tregellis' report, he did include some amounts for

9  estimated wind-down costs, I believe.  I'm not sure in Mr.

10 Crom's report whether or not he factored that into the

11 valuation, and in Mr. Mahta's report, I believe, without

12 looking at it again, that he primarily just relied upon Mr.

13 Tregellis' numbers.  I don't remember seeing any analysis

14 that he performed himself for wind-down costs.

15 Q    And then in the -- certainly in the Tregellis and the

16 Mahta reports, there is an analysis of a discount for cost

17 of collection I believe that you referred to in your

18 testimony,

19 A    I do remember seeing that in Mr. Tregellis' report.  I

20 don't remember seeing any analysis such as that in Mr.

21 Mahta's report, other than possibly saying that he agreed

22 with Mr. Tregellis' report.

23 Q    I believe you testified that essentially the

24 difference between your report -- and again, I'm referring

25 to Exhibit 1 -- and a liquidation analysis is that there

1  needs to be certain adjustments.  In addition there needs

2  to be under a liquidation analysis expenses for winding

3  down and an adjustment for a discount in terms of

4  collection.  Is that correct?

5  A    Yes, I agree with that.

6  Q    Okay.  And that's what Mr. Tregellis and Dr. Mahta did

7  as well, right?

8  A    Again, I know Mr. Tregellis included a fact -- that

9  was factored into his report.  Dr. Mahta, I didn't see any

10  work that he performed, other than he was relying -- he

11  agreed with Mr. Tregellis' report.

12  Q    And when a liquidation value is being arrived at,

13  long-term liabilities need to be considered as well, right?

14  A    Well, those would be part of the costs of winding down

15  the firm, yes.

16  Q    So for example, a lease, right?

17  A    A lease would have to be -- yes.  I mean you would

18  have to analyze the lease.  It's possible a lease could

19  have value.  It could have add to the value of a wind-down.

20  It's possible that it could be an expense that would have

21  to be deducted.

22  Q    Did you look at the lease that the firm had as of

23  August 2005 to determine the amount of any discount that

24  should be taken or liability that should be taken as a

25  result of that lease?

1  A    No, I did not.

2  Q    And in a liquidation of an entity, the costs would

3  include the cost of trying to pursue the accounts

4  receivable; is that right?

5  A    That's correct.

6  Q    That would also include the costs of negotiating out

7  of any existing agreements?

8  A    That's correct.

9  Q    Both in terms of the cost of the underlying agreements

10 and the time and expense it takes to negotiate those

11 agreements?

12 A    Well, I think you would have -- it would depend on who

13 was doing the negotiating.  If it was one of the firm's

14 partners, I don't think I would include that cost.  If

15 there was an outside party that had to be -- that was

16 engaged in the negotiations, then that would be included.

17 Q    And you would have to apply some amount, a reasonable

18 amount, for the time expended by that partner or person in

19 negotiating; wouldn't you?

20 A    I don't necessarily believe so.  If they have

21 personal -- in a situation where a partner would have

22 personal liability otherwise, I don't know that I would

23 factor their time into -- it would be for their own

24 benefit, and I don't know that I would factor their time in

25 for -- including it in the wind-down costs of the firm.

1  Q     Now, in your analysis, you -- in your report,

2  I believe you did an adjustment of $5,000 for the Oakland

3  rent and about $8,000 for the Oakland CAM charges, common

4  area maintenance charges, for the rental obligation in

5  Oakland.  Right?

6  A     That's correct.

7  Q     Yet you said you never did any kind of an analysis as

8  to whether that lease is valuable or not valuable.

9  A     No, what I did was I specifically asked Mr. Fotouhi

10 whether those amounts had ever been paid.  Again, I was

11 doing the report well over two years after the petition

12 date, and he never provided -- he purported those

13 liabilities but never provided any documentation that

14 they'd been paid.  So they were not considered in my

15 report.

16 Q     Similarly, you took fifty-eight hundred dollars out

17 for a malpractice loan.  That would be a loan that's

18 advanced for a malpractice premium.

19 A     I would have to take a look at that.

20         THE COURT: What exhibit are you referring to?

21         MR. DIVELBISS: It's Exhibit 1, Your Honor.  I

22 will find the adjustment.  I believe it's Exhibit 1(I).

23         THE COURT: Okay.  Thank you.

24 BY MR. DIVELBISS:

25 Q     Do you have that before you?

1  A    Yes.  Yes, I do.  I'm sorry.  Can you repeat your

2  question?

3  Q    Certainly.  My question is simply to confirm you took

4  out fifty-eight hundred dollars approximately from the

5  liability side that was referenced as a malpractice

6  insurance loan.

7  A    Yes, that's correct.

8  Q    Do you have any indication that that was not an

9  absolute obligation?

10 A    At this point I don't recall exactly.  It must have

11 been that I wasn't provided with something that documented

12 the amount.

13 Q    So if that amount was paid, then a further adjustment

14 should be made; is that correct?

15 A    If it was an actual liability of the firm as of that

16 date, yes.

17 Q    You also, as part of your analysis, removed as a

18 liability the expenses related to legal fees in the

19 Phillips, Spallas, Fotouhi matter?  Is that right?

20 A    I don't believe that that is correct.

21         THE COURT: Again, do you have an exhibit?

22         MR. DIVELBISS: I will find it, Your Honor.  I

23 apologize.

24         THE COURT: And as for this fifteen hundred dollar

25 adjustment on a malpractice insurance loan, I don't see

1  that on Exhibit (I) to Exhibit 1.  I have a fifty-eight

2  hundred and thirty-nine dollar adjustment.

3          MR. DIVELBISS: That's what I indicate, Your

4  Honor, I thought it was --

5          THE COURT: You said fifteen hundred dollars, I

6  think.

7          MR. DIVELBISS: I said fifty-eight hundred.  I'm

8  sorry if I wasn't clear.  I was rounding off.

9          THE COURT: Okay.

10  BY MR. DIVELBISS:

11  Q    So it's your testimony then that the cost for the

12  Phillips litigation was or should have been included as

13  part of any adjustment or -- I'm sorry -- it should be

14  included as part of the liabilities of the firm?

15  A    No, that is not my testimony.

16  Q    Is it your testimony that it should have been

17  excluded?

18  A    I don't believe that as of the petition date, that I

19  was provided any evidence that there was a liability as of

20  that date, that I can recall, for the litigation expenses.

21          THE COURT: There was no liability.  They paid it,

22  but it wasn't a liability of the firm.

23  BY MR. DIVELBISS:

24  Q    Maybe I'm stating the question incorrectly.  Was there

25  an adjustment done with respect to the net value of the

1  firm in which the amount that was paid for the Phillips

2  litigation was added back as an asset or an adjustment

3  for -- on the Fotouhi Epps balance sheet?

4  A    No, that would not have been the case.

5  Q    Okay.  I believe you testified you met with Mr.

6  Fotouhi on more than one occasion, on two different

7  occasions?

8  A    I believe that's correct, yes

9  Q    And he provided you with all the documents that you

10 asked for?

11 A    I would have to look back.  I'm not sure that

12 everything that I asked for was provided.  He provided me

13 all the documents that are included in the report.

14 Q    Well, what documents did you ask for that were never

15 provided?

16 A    I don't recall that off the top of my head.

17 Q    So your testimony is, as you sit here today, you

18 cannot recall any documents that you asked for that were

19 not provided; is that correct?

20 A    That's correct, at this time.

21 Q    Thank you.  If I could direct your attention now to

22 Exhibit 2.  In that -- in your Exhibit 2 -- you attempted

23 to do an analysis of the amounts that were recovered for

24 existing clients as of the petition date; is that correct?

25 A    Yes, related to post-petition services, yes.

1  Q    And that would be post-petition services rendered by

2  Mr. Fotouhi, right?  It would include that.

3  A    Yes.

4  Q    And that would include post-petition services rendered

5  by the other three partners; is that correct?

6  A    Yes, that's correct.

7  Q    You never attempted to carve out the amount that Mr.

8  Fotouhi generated, as opposed to the other partners?

9  A    No, I did not.

10 Q    So you simply looked at the total amount that was

11 realized post-petition by the firm and then applied an

12 expense rate, as it were, to come up with a net amount that

13 the firm made during this approximate three-year period.

14 A    That's correct, but it was limited to clients that

15 existed as of the petition date.  So if there were clients

16 that were not included in work in process as of the

17 petition date, those clients would have been excluded.

18 Q    Did it also include the accounts receivable that

19 were due as of the date of the petition?

20 A    No, the accounts receivable were included in the

21 initial report.

22 Q    But you also included work in progress in your first

23 report, right?

24 A    Yes.

25 Q    And that same work in progress was included in the

1  second report.

2  A    It was included as a starting point, and only the

3  additional work that was performed for those clients is

4  included in the second report.

5  Q    Again, directing your attention -- keeping your

6  attention on Exhibit 2, in your opinion, was there any of

7  that income, any of the income generated as a result of

8  something other than services performed by the lawyers in

9  the firm?

10  A    Sorry, I don't quite understand your question.

11  Q    There was no income that you considered that would

12  have been generated, other than by work of the lawyers,

13  right?

14  A    That's correct.

15  Q    And I apologize, I want to go back to your Exhibit 1

16  very quickly.  There were certain client writeoffs that you

17  considered that were proposed by Mr. Fotouhi.  Do you

18  remember those?

19  A    Yes.

20  Q    I believe you listed them as clients A through about F

21  or E?

22  A    Those were Mr. Fotouhi's notations, not mine.

23  Q    Okay.  And you accepted I believe one of the

24  adjustments suggested by Mr. Fotouhi, right?

25  A    I believe that that's correct.  I'd have to look at it

1  if you give me more time.

2  Q    And you rejected the remaining because as of two years

3  past the date that the work was performed, there was no

4  indication that the accounts receivable had been written

5  off, right?

6  A    I believe that that's correct, yes.

7  Q    And what would have to be done, in your mind, for it

8  to be, quote, "written off," close quote?

9  A    It would have to be written off on their time slips,

10 in their software, for tracking their time and billing.

11 Q    In your experience for a professional services

12 company, if an accounts receivable has not been paid for

13 two years, wouldn't you agree that there's a very high

14 probability it won't be paid?

15 A    I think it depends on what type of work you do.

16 Q    Let's use legal services.

17 A    For instance, legal services in a bankruptcy context?

18 I would say no, that would not be unusual.

19 Q    Legal services in the context of an ongoing law firm

20 that does hourly rates.

21 A    I think it would depend on what your practice was.  If

22 you sent out your bills every month, then I would say, yes.

23 You know, if you sent bills to all your clients every

24 month, then I would say, yes.  If you did not, if you had

25 an agreement with your client that it was a litigation

1  matter and that you had some different type of compensation

2  agreement, then I would say it may not be unusual.

3  Q    Do you know whether the Fotouhi Epps firm sent out

4  bills every month?

5  A    I do not know whether or not they sent out bills to

6  all their clients every month.  I presume that they sent

7  out some bills every month, yes.

8  Q    Well, let's presume that they sent out bills to the

9  five or six clients that you refused to take an adjustment

10 and they did it on a monthly basis, would it be a fair

11 conclusion to say that it's unlikely that their accounts

12 receivable would be recovered for those accounts, two years

13 post?

14 A    Yes, I would agree with that.

15 Q    Now in your analysis, you determined in your opinion

16 that Mr. Fotouhi holds approximately 38 percent of the

17 partnership, right?

18 A    As of the -- yes, as of the petition date.

19 Q    But you don't know what his percentage is post-

20 petition?

21 A    No, I do not.

22 Q    The partnership agreement, I believe that you had and

23 was presented to you today, doesn't indicate one way or

24 another the percentages of ownership; is that correct?

25 A    That is correct.

1  Q    Is it your understanding that under California law

2  that the default is each -- or equal owners?

3  A    I don't know what the law is in that regard.

4  Q    Now you testified that you reviewed the K-1's, both

5  2004 and 2005 to arrive at this 38 percent number.  I

6  believe your testimony was that the K-1's showed that Mr.

7  Fotouhi owned as an average about 38 percent?

8  A    No, I don't believe that that's the case.  I believe

9  that the -- there was a percentage, I believe without

10 looking at it again, for 2004, I believe that was 35.8

11 percent, and then it was somewhere approximately 25 percent

12 in 2005.  That's what the K-1's showed.

13 Q    You would agree with me that the K-1's do not indicate

14 ownership interest; they just indicate how much was

15 disbursed for that particular year, right?

16 A    No, I don't agree with that.

17 Q    Okay.  You think that they show ownership interest?

18 A    They definitely show ownership interest.  There's

19 three percentages on a K-1.  There's profit and loss;

20 profit, loss and capital percentages.  And capital -- it's

21 ownership of firm capital is the percentage.

22 Q    I'm sorry.  Your last statement was that the capital

23 account indicated the percentage ownership?

24 A    No, there's three percentages on the K-1.  There's a

25 profit percentage, a loss percentage, and then a capital

1  ownership percentage.

2  Q    That's Exhibit L to your Exhibit 1.

3  A    On these K-1's, they don't have a percentage in for

4  the capital percentage, which I don't understand, but --

5  Q    They only have a profit and loss percentage.

6  A    That's correct.

7  Q    And that -- when I say "that," I'm referring to the

8  percentages listed under profit and loss, do not

9  necessarily indicate ownership interest; do they?

10  A    Typically they would, but I suppose partners can have

11  different agreements where they wouldn't.

12  Q    They had an agreement that they were each equal

13  owners, and that in certain circumstances, somebody takes a

14  larger draw for that particular year.

15  A    Yes, that's possible.

16  Q    Do you have any reason to believe that didn't occur

17  for the Fotouhi Epps firm in either 2004 or 2005?

18  A    It wasn't part of my analysis.  I saw no documentation

19  regarding their ownership, other than the actual amounts

20  that were paid out of the firm, which is what I used.

21  Q    Mr. Fotouhi told you, did he not, that the percentage

22  interest was 25 percent for each of the four partners?

23  A    I believe that in the first meeting I had with him,

24  he did indicate that to me, yes.

25  Q    Did he ever indicate anything to the contrary?

1    A    I only spoke with him that one time about it.

2         THE COURT: You know, as to what Mr. Fotouhi said

3    or didn't say, I do think that the previous decision in his

4    objection to discharge trial would be binding on him, and

5    those findings in that case were that the nature of the

6    partnership and the percentage of interest in the

7    partnership changed according to whatever the needs or

8    circumstances were of the partners at the time.  That's a

9    footnote in that decision.

10         As to him at least, I think I'm safe in applying

11   that as an issue that's been decided.  So whatever he may

12   have said about what the partnership interests were, I take

13   with a total grain of salt.  I think, frankly, so that --

14   it maybe not help -- I'm not going to preclude you from

15   continuing to ask these questions of Mr. Pierotti, but I

16   think the most reliable way of determining partnership

17   interests for this purpose is what did they draw out of the

18   place, and I think that that's what happened here.  That's

19   how he arrived at the percentage of 38.59 percent.  And I

20   think that's an appropriate way of doing it.

21   BY MR. DIVELBISS:

22   Q    Just to go back to -- briefly to Dr. Mahta's report,

23   you have reviewed Dr. Mahta's report?

24   A    Yes, I did.

25   Q    Or reports?  And Dr. Mahta did make adjustments for

1  expenses and the cost of -- let me rephrase it.  Dr. Mahta

2  did make adjustments for the cost of liquidation; isn't

3  that correct?

4  A    I would have to look at his report again, but my

5  recollection is that he relied on the report of Mr.

6  Tregellis and basically stated an opinion that he agreed

7  with the positions that Mr. Tregellis had taken.  I don't

8  know that I saw any analysis in Dr. Mahta's report that he

9  himself performed.  I could be incorrect.  I would have to

10 read that again.

11 Q    Okay.  Well, and the primary difference between your

12 Exhibit 1 and Mr. Tregellis' report is in these adjustments

13 for discounting the amount for accounts receivable, not

14 considering that a hundred percent would be paid, right?

15 A    That's correct.

16 Q    And then the other significant adjustment or

17 difference between you Mr. Tregellis is that the cost of --

18 winding-up cost and liquidation, right?

19          MR. DAVIS: Objection.  Relevance as to comparison

20 to Mr. Tregellis' report, which is not going to be in

21 evidence in this case.  It hasn't been offered.

22          MR. DIVELBISS: I don't have any more questions

23 for Mr. Pierotti.

24          THE COURT: Okay.

25          MR. DIVELBISS: Thank you, Your Honor.

1              THE COURT: Mr. Davis?

2              MR. DAVIS: No more questions.

3              THE COURT: I have a couple of questions.  Just to

4    make sure I understand this completely, would it be

5    inappropriate for me to take the number in the second

6    report, which is $1,503,530, which consists of the value

7    that was received, proceeds, if you will, of the pre-

8    petition assets as well as the amount of cash, work in

9    progress and accounts receivable as of the petition date

10   from pre-petition assets, as to the value of the firm?

11   Would it be inappropriate for me to take that number and

12   multiply it times 38.59 percent to arrive at what the value

13   of the partnership was as of the petition date?

14             THE WITNESS: In my opinion, that would be

15   correct, Your Honor.

16             THE COURT: My math says $580,212.22, but I

17   haven't seen that calculation made by you in your report.

18   The reason I'm mentioning this is because your number is

19   567,000 plus change.

20             MR. DAVIS: The number of what?  That's what I'm

21   not following.

22             THE COURT: 38.59 percent times $1,503,530.

23             MR. DAVIS: Without a calculator, I --

24             THE COURT: Well, that's what my calculator says.

25             MR. DAVIS: Okay.

1          THE COURT: Anyway, I just wondered about the

2   discrepancy, assuming I accept the number.

3          MR. DAVIS: Over the lunch break, I'll try to

4   figure out -- I'll try to figure out what that discrepancy

5   is.

6          THE COURT: All right.  Mr. Pierotti, did you go

7   over the books and records of this company from the date of

8   the petition, or let's say from the date of the petition

9   until the end point in the records that you received?

10          THE WITNESS: Until very recently, within -- I

11   believe it was last week, I did receive some ledgers, but

12   that was well after I prepared my report.  Prior to that,

13   the only --

14          THE COURT: No, but I'm just talking -- did you go

15   over those ledgers?

16          THE WITNESS: I didn't go over -- I looked at the

17   ledgers.  I wouldn't say that I've looked in detail --

18          THE COURT: Is it your understanding from those

19   ledgers that Mr. Fotouhi actually did receive compensation

20   that would have related to some of these pre-petition

21   assets, post-petition?

22          THE WITNESS: I would have to say that that's the

23   case, yes, Your Honor.  I know he had post-petition draws

24   out of the firm, yes.

25          THE COURT: All right.  That's all I wanted to

1  know.  Anything further from this witness?

2          MR. DAVIS: No, your Honor.

3          THE COURT: Then you may step down.

4          THE WITNESS: Thank you, Your Honor.

5          THE COURT: And you may call your next witness if

6  you have one.

7          MR. DAVIS: Mr. Mansdorf?

8          THE COURT: All right.

9    PAUL MANSDORF, PLAINTIFF AND PLAINTIFF'S WITNESS, SWORN

10         THE CLERK: Do you swear or affirm under penalty

11  of perjury that the testimony that you're about to give in

12  this proceeding is the truth, the whole truth, and nothing

13  but the truth?

14         THE WITNESS: Yes.

15         THE CLERK: Please state your full name for the

16  record.

17         THE WITNESS: Paul Jordan Mansdorf.

18                    DIRECT EXAMINATION

19  BY MR. DAVIS:

20  Q   Mr. Mansdorf, are you the trustee in the Fotouhi

21  bankruptcy?

22  A   Yes, I am.

23  Q   And you are a plaintiff in this lawsuit?

24  A   Yes.

25  Q   Between the time that Mr. Fotouhi filed bankruptcy and

1  the time that you initiated the litigation that we're here

2  today on, did the Fotouhi Epps firm ever make any attempt

3  to buy the estate's interest?

4  A    I don't recall ever receiving an offer.

5         MR. DAVIS: That's all I have.

6         THE COURT: Any cross?

7         MR. DIVELBISS: Yes, Your Honor.

8                    CROSS-EXAMINATION

9  BY MR. DIVELBISS:

10  Q    Good morning again, Mr. Mansdorf.

11  A    Good morning.

12  Q    The amount that you as the Trustee has made –– has

13  demanded has been based upon a dissolution of the firm;

14  isn't that right?

15  A    Are you talking about demanded in the complaint ––

16  Q    In this case.

17  A    –– or demanded pursuant to FRE 408?

18  Q    Well, in terms of the demands against the Fotouhi Epps

19  firm and its partners ––

20         MR. DAVIS: Objection –– I'm sorry.

21  BY MR. DIVELBISS:

22  Q    –– that has been made based upon –– you've been

23  claiming that there's a dissolution of the firm; is that

24  right?

25         MR. DAVIS: Beyond the scope of direct, Your

1 Honor.

2          THE COURT: Overruled.

3          MR. DIVELBISS: Go ahead, sir.

4          THE WITNESS: Can you repeat the question, please?

5 BY MR. DIVELBISS:

6 Q    Yes.  The demand that you've made in this case has

7 been a demand based upon an assertion that there's a

8 dissolution of the firm; isn't that right?

9 A    I'm a little bit confused by the question.

10 Q    Okay.  I apologize.  You're claiming that there's a

11 dissolution that --

12 A    Perhaps I could look at the complaint and refresh my

13 recollection about exactly the allegations --

14          THE COURT: Well, the first thing I think -- I

15 don't want to do your interrogation, but was there a demand

16 made, Mr. Mansdorf, for payment of this partnership

17 interest?  Did you ever make a demand, just a demand, not

18 what you said in your complaint.  Have you ever made a

19 demand that you be paid for whatever Mr. Fotouhi's interest

20 was in the partnership?

21          THE WITNESS: If I did, I would recall that the

22 response -- it would have been a futile demand, because the

23 Debtor's contention was that the firm was worthless and his

24 interest in the firm was worthless until I believe well

25 after the time that the case was filed -- this litigation.

1          THE COURT: All right.  Sorry I asked.  Go ahead.

2    BY MR. DIVELBISS:

3    Q    So you don't have a recollection of ever making a

4    demand?

5    A    My recollection is the Debtor's contention was that

6    his interest in this firm was worthless, valued at zero,

7    until the time that this litigation was already pending.

8    That's my recollection.  And that any discussions that we

9    had with the Debtor and/or his counsel were not very

10   fruitful in any regard.  That's my recollection at this

11   time, you know, four years later.

12   Q    Okay.  Would it be fair to say then that there was

13   never a demand on either the -- on the partnership itself?

14   A    I'd have to review my records in this case, but as I

15   sit here today, I do not recall a specific demand.

16   Q    And you don't recall a demand on Ms. Hilger; is that

17   right?

18   A    I don't recall as I sit here today a specific --

19   Q    And you don't recall -- I apologize for interrupting.

20   A    -- demand on Ms. Hilger.

21   Q    And you don't recall a demand on Mr. Epps; is that

22   correct?

23   A    I don't recall a demand on Mr. Epps.

24   Q    And you do not recall a demand on Mr. Gilroy?

25   A    I do not recall a demand on Mr. Gilroy.

1  Q    And it's correct, is it not, that you did not make a

2  demand on Mr. Fotouhi because you felt it was futile, based

3  upon his assertion that the value of the firm was zero.

4  A    My recollection today is that would be accurate.

5  Q    You're not aware of any document, are you, that

6  indicates that there was an agreement among the partners of

7  the Fotouhi Epps, Hilger and Gilroy firm to dissolve?

8  A    I'm not aware of such a document.

9  Q    The firm is a law firm, right?

10 A    I believe so.

11 Q    And wasn't formed for a joint venture or a single

12 purpose, right?

13 A    It seemed to be a general purpose law firm.

14 Q    You're not aware of any partner of the Fotouhi, Epps,

15 Hilger & Gilroy firm making some application to dissolve

16 the firm, right?

17 A    I am not aware of that.

18 Q    And you're not aware of any application by any member

19 of the firm for a judicial dissolution; are you?

20 A    I'm not aware of that.

21         MR. DIVELBISS: I don't have any more questions

22 for Mansdorf.  Thank you.

23         THE COURT: Anything further?

24         MR. DAVIS: I don't either, Your Honor.

25         THE COURT: You may step down.

1          THE WITNESS: Thank you.

2          MR. DAVIS: Your Honor, I move Exhibits 3 through

3    6 into evidence.

4          THE COURT: 3 is the bankruptcy petition and the

5    statement of financial affairs of Mr. Fotouhi.  4 is the

6    order denying Mr. Fotouhi's discharge.  5 is the

7    partnership agreement and 6 is the declaration of Mr.

8    Fotouhi regarding why he never registered his limited

9    partnership with the Bar Association or the State Bar, I

10   should say.  Do you have any objection to any of these?

11         MR. DIVELBISS: If I could, Your Honor.

12         THE COURT: You've objected to 4, and I've

13   overruled that objection.

14         MR. DIVELBISS: Again, Your Honor, if I could,

15   Exhibit 3, I do not have any objections.

16         THE COURT: Okay.

17         MR. DIVELBISS:  I believe Your Honor could take

18   judicial notice.  I understand your court's ruling about --

19   I re-assert my objection to Exhibit 4.  With respect to

20   Exhibit 5, the partnership agreement, I have no objection.

21   With respect to Exhibit 6, we object.  I don't believe it

22   is admissible.

23         THE COURT: It's a statement by a party; isn't it?

24         MR. DIVELBISS: It's a declaration apparently by

25   Mr. Fotouhi in another action.

1       THE COURT: But that's a sworn statement.  Isn't

2  it admissible regardless of anything?

3       MR. DIVELBISS: No, Your Honor, I don't believe

4  that it is under Rule 804.

5       THE COURT: Well, let's see.

6       MR. DIVELBISS: Certainly with respect to the law

7  firm and with respect to the three partners, other than Mr.

8  Fotouhi, those partners did not have an opportunity at that

9  prior proceeding to develop the testimony that is listed in

10 the declaration, and certainly with respect to those three

11 partners, it should be inadmissible.

12      THE COURT: Well, I'm going to admit it, putting

13 aside whether or not there's an 804 problem or nor.  I

14 don't think there is.  But in any event, I'm going to admit

15 it partly because I don't think it makes any difference.

16      Mr. Davis -- if you'll excuse me for just one

17 moment -- you have cited in your brief <u>Olsen versus Cohen.</u>

18 <u>Olsen versus Cohen</u> deals with the failure to register a law

19 corporation, and it deals with the specific Code section

20 for the dissolution of a law corporation -- excuse me, not

21 a dissolution -- but the registration of a law corporation

22 is dealt with in Section 6160 and 6161 of the California

23 Business and Professions Code.  This, however, was not a

24 California law corporation.  It was a limited partnership,

25 and as I understand Section 16306(f), that section says:

1          "The limitation of liability in subdivision (c)

2          shall not apply to claims based upon acts, errors

3          or omissions arising out of the rendering of

4          professional limited liability partnership

5          services of a registered limited liability

6          partnership providing legal services, unless that

7          partnership has a currently effective certificate

8          of registration issued by the State Bar."

9          I think that this is the governing provision, and

10   that Cohen versus Olsen is inapplicable, because it deals

11   with a separate statutory provision.  Why they say

12   different things, I don't know, but they do.  Therefore I

13   believe –- and I'm willing to find as a matter of law that

14   the limited partners of the limited partnership are not

15   liable for the value of Mr. Fotouhi's partnership interest

16   personally.

17          And so to the extent that you are attempting to

18   have me find that they are personally liable as opposed to

19   the partnership being liable, I decline to do so.  So that

20   kind of makes the whole purpose for No. 6 kind of

21   superfluous, but I'm going to let it in anyway, that being

22   Exhibit No. 6.

23          Now, would you like to call your first witness.

24   Otherwise, all the exhibits, in other words, are admitted.

25   ///

1          (Whereupon, Plaintiff's Exhibit

2              Nos. 3, 4, 5 and 6, are admitted

3              into evidence.)

4          MR. DIVELBISS: Your Honor, the only witness we

5  had listed on our witness list, Mr. Mahta, I had conferred

6  with counsel, and indicated that we thought we would get to

7  the lunch hour.  He is en route.  I'm asking if we could

8  just --

9          THE COURT: He isn't standing outside the door

10  right now, is he, pacing back and forth?

11          MR. DIVELBISS: Well, he may be.  Could I --

12          THE COURT: Please do.

13          MR. DIVELBISS: Thank you, Your honor.

14          THE COURT: I think he is.

15          MR. DAVIS: No reason for anyone else to be pacing

16  outside.

17          THE COURT: As far as I know, there wouldn't be,

18  no.

19      (Pause.)

20          MR. DIVELBISS: Yes, Your Honor, Dr. Mahta is

21  here.  My preference, if I could, Your Honor, we're at a

22  quarter of, if we could break early for lunch and come back

23  early.

24          THE COURT: Okay.  How much time do you want for

25  lunch?  1:00 o'clock?

1          MR. DIVELBISS: 1:00 o'clock would be fine, Your

2    Honor.

3          MR. DAVIS: Fine.

4          THE COURT: Fine.  Then we'll stand in recess

5    until 1:00 o'clock.

6          MR. DIVELBISS: Thank you very much.

7      (Whereupon, the luncheon recess is taken at 11:43

8    a.m., and the court is reconvened at 1:00 p.m.)

9          THE COURT: All right.  You may call your first

10   witness.

11         MR. DAVIS: Before we start back, could I just

12   address the question that the Court raised about the --

13         THE COURT: Okay.

14         MR. DAVIS: Because in doing so, we discovered an

15   error I think we need to clear up.  I don't know how I came

16   up with 567.  That's clearly a math error, but in looking

17   back at that, we see that there's an error in Report No. 1

18   where a long figure was carried forward and it tends to

19   overstate the damages, and if you look at the conclusion of

20   Report No. 1, it refers to the valuation of 492,215.

21         THE COURT: Right.

22         MR. DAVIS: That carries forward the wrong number

23   from E, Exhibit E to the first report.  It should have

24   carried forward the number just above it on that --

25         THE COURT: 404,700?

1          MR. DAVIS: Exactly.

2          THE COURT: Okay.

3          MR. DAVIS: And that's an error that we just

4    recognized at lunchtime.

5          THE COURT: Okay.  Anything else?

6          MR. DAVIS: No, Your Honor.

7          THE COURT: That's it?

8          MR. DAVIS: That's it.

9          THE COURT: All right.  Thank you.

10         MR. DIVELBISS: Good afternoon, Your Honor, we

11   would like to call Mr. Fotouhi --

12         THE COURT: He's not listed as one of your

13   witnesses; is he?

14         MR. DIVELBISS: He is listed -- no, he's not, Your

15   Honor.  We call him for the limited purpose of discussing

16   some of the statements made by Mr. Pierotti, including the

17   issue of the adjustment on the retirement account and also

18   for the purposes of the reasonable value of services

19   rendered after the date of filing of the petition.

20         THE COURT: Okay.  You know, I went back -- just

21   so everybody is aware of this -- I went back and took a

22   look at the Simmons case out of the Ninth Circuit, which I

23   believe you cited in your brief, Mr. Divelbiss, and I want

24   to read something from page 1211, 725 F2d, 1211, out of

25   that case.

1          MR. DIVELBISS: And I apologize, Your Honor,

2     that's from our proposed findings?

3          THE COURT: Yes.

4          MR. DIVELBISS: Okay.

5          THE COURT: You cited this case.  It's the seminal

6     case on 541(a)(6) and the exception in 541(a)(6), and it

7     says -- they talk about sole proprietorships, and the

8     earnings exception in the sole proprietorship section.  And

9     then the court says:

10               "This contrasts with the situation that prevails

11               when the debtor's business is a partnership or a

12               corporation.  In those cases, there is no

13               individual debtor so the earnings exception is

14               not applicable and the earnings of the business

15               will accrue to the estate under Section

16               541(a)(6)."

17          It seems to me that all of these cases involve

18     situations where the Debtor is a sole proprietor.  Now

19     granted, the partnership here is not the Debtor, but the

20     Debtor works for the partnership, and it seems to me if

21     you're trying -- that the Debtor's earnings from the

22     partnership are just not applicable, or that 541(a)(6) --

23     the exception to 541(a)(6) just doesn't apply to someone

24     who is working for someone else, because they're drawing

25     basically a salary just as Mr. Fotouhi made draws.  And by

1 the way, during the lunch break, I was able to read his

2 deposition, and it's quite clear from his deposition that

3 he was taking draws from the partnership. So I'm not sure

4 that the earnings exception of 541(a)(6) has much, if any,

5 applicability here.

6 For that matter, why is it that the -- and I

7 suppose we've already discussed this, but I'm having a hard

8 time understanding why it is that the actual value of the

9 pre-petition accounts and the proceeds from those accounts

10 should not be included as the value of the partnership

11 interest as opposed to what would have happened if Mr.

12 Fotouhi had left the partnership as of the date of the

13 petition -- which didn't happen.

14 MR. DIVELBISS: The answer to the second question

15 first, Your Honor, is because under the Corporations Code,

16 when Mr. Fotouhi filed, he became a disassociated partner.

17 THE COURT: M-hm.

18 MR. DIVELBISS: Prior to, say, ten years ago, they

19 treated that as an effective dissolution of the

20 partnership.

21 THE COURT: But what -- what the Corporations Code

22 contemplates is that the person actually become

23 disassociated, and that didn't happen here. This person

24 didn't go anyplace. He stayed, and whether it was from his

25 labors or somebody else's labors, the fact is that these

1 accounts -- a significant amount of money to the tune of

2 $1,011,315 was realized from these accounts. Now it may

3 have been because he did stay. I probably wouldn't argue

4 with that, but the fact that the Corporations Code deals

5 with an issue based upon facts on the ground, which is that

6 the person who's actually disassociated, I don't think

7 ought to have -- ought to control where the partner doesn't

8 disassociate. He's still there. It's like I said earlier,

9 it's like nothing ever happened after the bankruptcy.

10 MR. DIVELBISS: But the reality is, Your Honor, as

11 soon as he files, he becomes, as a matter of law, a

12 disassociated partner.

13 THE COURT: That may be, but then the reality is

14 that "x" amount of dollars are made in the way of proceeds

15 from pre-petition property of the estate, and that is

16 actual real dollars that were made and have to be included

17 as proceeds under 541(a)(6). We can argue about this in

18 final argument, but I just wanted to tell you what my

19 thinking was at this point, on where we're at here. So if

20 you'd like to call Mr. Fotouhi, feel free.

21 MR. DIVELBISS: Okay.

22 SHAHAB EDDIN FOTOUHI, DEFENSE WITNESS, SWORN

23 THE COURT: Do you swear or affirm under penalty

24 of perjury that the testimony you are about to give in this

25 proceeding is the truth, the whole truth, and nothing but

1  the truth?

2                THE WITNESS: I do.

3                THE COURT: Please state your full name for the

4  record.

5                THE WITNESS: Shahab Fotouhi.

6                        DIRECT EXAMINATION

7  BY MR. DIVELBISS:

8  Q    Good afternoon, Mr. Fotouhi.

9  A    Good afternoon.

10 Q    In Mr. Pierotti's report, there was a reference to

11 certain retirement account obligations for the tax year of

12 2004.  They were listed as an obligation in 2005.  Are you

13 aware of those?

14 A    Yes.

15 Q    Were those obligations promised to the respective

16 partners of the Fotouhi, Epps, Hilger and Gilroy, LLP firm?

17 A    To the best of my recollection, there was a promise

18 made, a contribution to the retirement account of the

19 various partners, the amount of which was unknown when the

20 promise was made because it depended upon what proceeds we

21 had available at the time.

22 Q    Directing your attention to the post-petition work

23 done by you and your partners, generally do the four of you

24 work hard?

25 A    We try to.

1  Q    And do you have contract attorneys in your office?

2  A    We have, since the inception of the firm, for various

3  reasons retained outside contract attorneys, so to speak,

4  to work on cases.

5  Q    And during the period of 2005 through date, at what

6  rate are those contract attorneys paid?

7  A    It's varied from $75 to $85 an hour depending upon

8  experience and the task involved.

9  Q    And how much has each of your partners been paid for

10  services rendered for the various clients from the period

11  of say 2006 on?

12        MR. DAVIS: Objection.  Vague and ambiguous.

13        THE COURT: Overruled.

14        MR. DAVIS: And I was going to add the additional

15  thing that I don't believe this is information that's been

16  supplied to us pursuant to Rule 26.

17        THE COURT: Have you requested it?

18        MR. DAVIS: Rule 26 –- this apparently relates to

19  their affirmative defense.  It's their affirmative

20  obligation to supply the information, and nothing like this

21  was supplied.

22        THE WITNESS: This is included in our general

23  ledger –-

24        THE COURT: Just a second, Mr. Fotouhi.

25        MR. DIVELBISS: Your Honor, first of all, our

1 affirmative defenses only recently –- was only recently --

2 maybe I think only today filed. The issue only came up

3 earlier this year. The records that have been provided --

4 as indicated, you can see from Mr. Fotouhi's deposition,

5 Mr. Davis has the information as to what the partners are

6 getting on their respective draws. Mr. Fotouhi also

7 testified to that fact during his deposition as to the

8 amount of the draws. So both documentary evidence and

9 testimonial evidence have been provided to Mr. Davis.

10         MR. DAVIS: Your Honor, I don't disagree that the

11 draw information was supplied, but he asked a different

12 question, and that was, he was linking the amount they

13 received to the specific accounts that existed on the date

14 of his petition.

15         THE COURT: What I thought he was asking was, how

16 much they paid lawyers to collect on accounts or to process

17 accounts.

18         MR. DAVIS: Nothing like that has been produced to

19 us.

20         THE COURT: Isn't that what you were asking?

21         MR. DIVELBISS: And I apologize, Your Honor, I'm

22 not quite sure I understand the way --

23         THE COURT: Isn't your question directed to the

24 issue of how much it cost to actually go out and realize

25 the value of pre-petition cases that came into the estate?

1          MR. DIVELBISS: Yes, Your Honor.

2          THE COURT: And did you provide that information

3    to Mr. Davis?

4          MR. DIVELBISS: What we had provided is what I

5    indicated to you earlier, Your Honor.  We provided the

6    ledger, which shows the -- the complete ledger.  We

7    provided --

8          THE COURT: What does the ledger have in it that

9    would allow someone to figure that out?

10          MR. DIVELBISS: A ledger would allow one to take a

11    look and see what the individual lawyers were paid.

12          THE COURT: M-hm.

13          MR. DIVLEBISS: The information also, as Mr.

14    Pierotti went through it, you can then be able to apply

15    that because if Mr. Pierotti pulled out all of the

16    information, the information we provided shows both pre and

17    post-petition income.

18          THE COURT: M-hm.

19          MR. DIVELBISS: And so the only way that could

20    reasonably be done then would be to then do an application.

21    Let's assume that no new clients were obtained, and it

22    shows a percentage of new clients, but if no new clients

23    were obtained, then it's easy --

24          THE COURT: Here's the thing, I'm not going to let

25    him testify about this without the ledger being in evidence

1  and it hasn't been introduced, and it's not marked as an

2  exhibit.  And I'm not even sure if you introduced and I

3  allowed into evidence the ledger that you could segregate

4  out what work was performed by which attorneys on which

5  accounts, either pre or post-petition.  What you're telling

6  me is not making at all clear that that could –- in fact

7  that you could segregate out based upon the Quick Books,

8  what attorney worked on which account, when, and for how

9  long.

10        MR. DIVELBISS: That's exactly what Mr. Pierotti

11 did though or attempted to do and based upon the same

12 information.

13        THE COURT: But he was unable –- but as far as I

14 know, he did not indicate –- am I correct in

15 understanding –- he did not indicate that he was able to

16 break out the amount of time that was actually spent on

17 particular accounts because he didn't have any time sheets.

18 Correct?

19        MR. DIVELBISS: No, actually what I believe Mr.

20 Pierotti testified was that he did not –-

21        THE COURT: He didn't have time sheets.  The

22 answer to that question I thought unequivocally was no.

23        MR. DIVELBISS: What Mr. Pierotti testified to was

24 that he was not –-

25        THE COURT: He didn't have time sheets.

1          MR. DIVELBISS: I believe he testified no.

2          THE COURT: No.

3          MR. DIVELBISS: I believe that --

4          THE COURT: Well, how could he do what you're now

5    attempting to do by having Mr. Fotouhi estimate, when after

6    you read his deposition, he seemed to have very little

7    recollection at all as to what the accounts actually

8    showed.  Why would I allow him to simply estimate how much

9    time, for example, was spent on the pre-petition accounts

10   or the accounts that were existing as of the date of the

11   filing of the petition -- how much time lawyers spent

12   working on those accounts, post-petition?

13         MR. DIVELBISS: He could do, again, a very similar

14   situation to what Mr. Pierotti did.  He can explain how

15   much was paid, and that's what the question was going to be

16   is, how much was paid to these various lawyers, number one,

17   and then what percentage is pre and post, an approximate

18   percentage of pre and post.

19         THE COURT: Yes, but that doesn't tell us what

20   percentage of the work they did either pre or post was

21   actually done on these accounts.

22         MR. DIVELBISS: Well, it gives you an estimate,

23   and that's --

24         THE COURT: No, it doesn't, because it would be --

25   you haven't laid -- I mean I'm not a big foundation person,

1  but you haven't laid any foundation whatsoever for this

2  witness being able to say what percentage or what amount of

3  time was spent by contract attorneys or partners or both on

4  a particular account at a particular point in time.

5          MR. DIVELBISS: That's correct, Your Honor.

6          THE COURT: And I'm not going to allow him to just

7  sit on the witness stand and make an estimate, after having

8  just read his deposition a half an hour ago, and state what

9  it is that he thinks they would have spent to collect

10 whatever accounts were in existence as of the date of the

11 filing of the petition.  I'm not going to allow him to do

12 that.

13         MR. DIVELBISS: Okay.

14         THE COURT: And I'm not going to -- even if you

15 were to ask me and you haven't yet to introduce all the

16 time sheets and/or all -- the ledger -- I'm not going to

17 allow you to just dump that on my desk and have me figure

18 it out, because I don't believe that's appropriate either.

19 So the objection is sustained on the grounds I've just

20 indicated.

21         MR. DIVELBISS: To the question that Your Honor

22 posed about trying to do the allocation.

23         THE COURT: Yes.

24 BY MR. DIVELBISS:

25 Q    Mr. Fotouhi, how much do your partners make on an

1  annual basis?

2  A    Currently -- and I believe that this has been in place

3  for a couple of years, depending upon availability of cash,

4  my partners each draw $12,000 a month on average.  My

5  memory is a little foggy, but I recall that it was less

6  than that initially when we started, and at some point, it

7  was increased to that amount.  But I believe it was around

8  the petition time when it was increased to that amount.  So

9  about $144,000 a year is what they each make.

10  Q    And how much do you make?

11  A    My standard draw is -- was again changed, but

12  currently it's eighty-five hundred dollars twice a month,

13  depending upon availability of cash.

14  Q    Can you give me an estimate of how much money you have

15  paid to contract lawyers on a yearly basis, starting with

16  2008?

17         MR. DAVIS: Objection, Your Honor.  This is going

18  down the same path, and --

19         THE COURT: I'll let him answer that question

20  because it doesn't go directly to what I've just addressed.

21  Overruled.

22         THE WITNESS: We have traditionally paid contract

23  attorneys, depending upon experience, between $75 and $85

24  an hour, and we do the same compensation package for most

25  of our associates at the firm, meaning that depending upon

1  level of experience, that associate is paid a per hourly

2  wage for hours billed.  And again, that ranges from 75 to

3  $85 an hour.

4  BY MR. DIVELBISS:

5  Q    On a gross amount, on a yearly basis, how much do you

6  pay contract lawyers?

7  A    I don't -- you know, if they were to work eighteen

8  hundred hours a year, which is average, if one was to do

9  that and there was enough work for somebody to do that,

10 that could be up to hundred and seventy, eighty thousand

11 dollars a year.  I don't have those calculations in front

12 of me.

13 Q    Okay.  You don't know the actuals.

14 A    I don't, but they're included in the ledgers which

15 show what we paid contract attorneys over time.  I should

16 add, just one issue is that the numbers may be plus or

17 minus ten to fifteen percent for every given year,

18 depending upon whether or not we settled the plaintiff's

19 case or whether or not we had cash flow issues.

20 Q    Are you able to allocate how much time is spent on --

21 over the last three plus years -- on matters that were firm

22 matters as of the date of the petition, as opposed to those

23 that came in after?

24      MR. DAVIS: Objection, Your Honor.  I'm sorry, I

25 thought you were done.  Objection.  This is the year you

1  ruled on.

2         THE COURT: Sustained.

3         MR. DIVELBISS: Your Honor, I'm simply asking the

4  foundational question of whether he can make that estimate.

5         THE COURT: Even if he could, the only records

6  that are going to make any difference are records that are

7  not in evidence, and that's the accounts and the time

8  sheets.  I'm just not going to allow him to sit there,

9  after what I read in his deposition, which indicates

10  virtually no recollection whatsoever as to –- even his

11  testimony here is vague as to how much everybody is drawing

12  out of the firm, how much the partners are drawing.  He's

13  not even sure about that.  I'm not going to let you get

14  into evidence a number that obviously he's not competent to

15  testify to.

16         MR. DIVELBISS: That's why I'm trying to ask the

17  foundational questions to establish competency, Your Honor.

18  The offer of proof would be that he can give an estimate of

19  the percentage of time that is spent on those matters, and

20  then that would be applied to –-

21         THE COURT: If you really wanted to prove what it

22  took to collect those accounts, that million dollars that

23  was collected on these pre-petition accounts or accounts at

24  the time of the petition, there was a way to do it.  But

25  putting him on the witness stand without any supporting

1  documents whatsoever and having him guesstimate what that

2  would be, I just don't think is appropriate.  I think it's

3  just beyond the bounds of competency, and I'm not going to

4  let him do it.  The objection is sustained.

5          MR. DIVELBISS: Okay.  All right.  Well again, my

6  offer of proof is that he would be able to do that, Your

7  Honor.  I will obviously --

8          THE COURT: Okay.  That's your offer of proof.

9  BY MR. DIVELBISS:

10  Q    Just to go back for clarification, Mr. Fotouhi, let's

11  see if we can do it year by year for each partner, of what

12  their compensation was, for you, for the years 2005, after

13  the filing of the petition

14  A    As I sit here today, I have no recollection as to

15  what -- I know we, again, turned over the general ledger

16  which one can go through and figure out those numbers, and

17  I believe we produced K-1's and tax returns to the

18  Trustee's accountants.  I have honestly no recollection of

19  what I made, but again, as I said -- testified earlier, the

20  most accurate response I can provide you is that -- it

21  would be that eighty-five hundred every two weeks, about

22  $204,000 a year, on average, for the last three years, plus

23  or minus ten to fifteen percent.

24  Q    Okay.  And then the 144,000 that you referenced for

25  your three partners, would that be on average over the last

1 | three years?

2 | A     I would say plus or minus ten to fifteen percent.

3 | That's the most accurate answer I can give you without

4 | looking at the records.

5 | Q     Okay.

6 |             MR. DIVELBISS: I don't have any more questions

7 | for Mr. Fotouhi.  Thank you.

8 |             THE COURT: Do you have any cross-examination?

9 |             MR. DAVIS: No, Your Honor.

10 |             THE COURT: You may step down.  And may he be

11 | excused?

12 |             MR. DAVIS: Yes.

13 |             THE COURT: Okay.  You may call your next witness.

14 | He's there.  I just saw him.

15 |             Sir, would you step forward to the witness stand

16 | and remain standing please.

17 |               CHARLES MAHTA, DEFENSE WITNESS, SWORN

18 |             THE CLERK: Do you swear or affirm under penalty

19 | of perjury that the testimony you are about to give in this

20 | proceeding is the truth, the whole truth, and nothing but

21 | the truth?

22 |             THE WITNESS: I do.

23 |             THE COURT: And you may be seated.  Thank you.

24 |                         DIRECT EXAMINATION

25 | BY MR. DIVELBISS:

1  Q     Dr. Mahta, good afternoon.  How are you?

2  A     Good afternoon.  Fine, thank you.

3  Q     Thanks for coming down.  Can you tell us a little bit

4  about your educational and work history, please.

5  A     I have a bachelor of arts in economics from Lafayette

6  College.  I have a Ph.D. in economics from the University

7  of North Carolina, Capitol Hill.  I have been working in

8  the consulting field since approximately -- early 1992.  I

9  have provided economic consulting in various contexts

10  ranging from general economic questions for clients,

11  litigation related, forensic economics.  I've done

12  valuation work.  I've worked in the intellectual property

13  area.  I've done a fair amount of work in the employment

14  discrimination area as well as personal injury and

15  antitrust.

16  Q     And have you testified as an expert in the past?

17  A     I have.

18  Q     And you've been qualified in both State and Federal

19  Courts?

20  A     Yes.

21         MR. DIVELBISS: Your Honor, we would move to have

22  Dr. Mahta accepted as an expert.

23         MR. DAVIS: I don't -- I'd like to voir dire here.

24         THE COURT: All right.

25  ///

                         VOIR DIRE EXAMINATION

1  BY MR. DAVIS:

3  Q    Mr. Mahta, you said, and I quote: "I've done valuation

4  work."  What does that mean?

5  A    From time to time, I've been asked to estimate damages

6  to a firm, resulting from the actions of another.

7  Q    That means you've been estimating damages.

8  A    Oftentimes in the context of that estimation, there is

9  a valuation question.

10 Q    Have you ever -- are you an accountant?

11 A    I am not.  I am not a CPA.

12 Q    Have you ever testified as an expert as to the

13 valuation of an entity?  Not damage calculations,

14 valuation.

15 A    Yes, I have.

16 Q    In what case?

17 A    It was a case involving an Internet startup.

18 Q    What's the name of the Internet startup?

19 A    Oh gosh, I don't recall.  It's listed on my C.V.

20 Q    Okay.  The C.V. is before you.  Well, I assume that

21 you have a Defendants' Exhibit book in front of you?

22 A    Is that this?

23            THE COURT: That's the Plaintiff's.

24            MR. DAVIS: It should be very thin because there's

25 only your reports in there.

1          THE COURT: There you go.

2          THE WITNESS: Okay.

3   BY MR. DAVIS:

4   Q    Your C.V. is part of your report; is it not?

5   A    It is.

6   Q    Would you tell me where that's listed?

7        (Pause.)

8   A    It's in Case No. 4.

9   Q    That's -- I'm not sure I can pronounce it.

10  A    I'm sorry, under the antitrust section.

11  Q    Oh, In re Big Store?

12  A    Yes.

13  Q    So are you saying that you valuated an entity in that

14  antitrust litigation?

15  A    Yes.

16  Q    And what kind of entity was it?

17  A    It was an Internet -- on line Internet store.

18  Q    Other than that one instance, have you ever been

19  retained to value businesses in any other cases?

20  A    I don't believe I've testified to that.  A number of

21  my non-litigation work has been in the valuation field.

22  Q    And have you ever valued a law firm or a partnership?

23  A    I haven't.

24  Q    Did you actually prepare any analysis in this case of

25  the law firm?

1 A     I did not do an analysis de novo.  I looked at

2 analyses of -- accounting analyses done by other experts in

3 this case.

4 Q     So your opinion is based solely upon your reading

5 somebody else's work?

6 A     I reviewed their analysis, yes.

7 Q     And that analysis is not in the exhibit book; is it?

8 A     This exhibit book?

9 Q     Yes.  It's Defendants' Exhibit Book.

10 A     Not that I know of, no.

11          MR. DAVIS: Your Honor, I'm not sure what the

12 witness is being called for, but he's done no analysis

13 himself.

14          THE COURT: Well, he doesn't have to do an

15 analysis of his own; does he?  He can look at other

16 people's analyses and make an expert -- give an expert

17 opinion if he's qualified as an expert.

18          MR. DAVIS: Yes, but as an economist, what I read

19 in his report is he gives projections and runs numbers.  I

20 haven't heard him say that he's done anything that would

21 qualify him as an expert in valuing entities, except in the

22 most general terms.

23          THE COURT: Well, that may run to how much weight

24 I give his analysis, but I don't think it runs to his

25 competence as an expert.

1           MR. DAVIS: I'll let it go at that then, Your

2  Honor.

3           THE COURT: Fine.  He's admitted as an expert.

4           MR. DIVELBISS: Thank you, Your Honor.

5  BY MR. DIVELBISS:

6  Q    As part of your assignment, I believe you indicated

7  you reviewed other individuals' reports; is that correct?

8  A    Yes.

9  Q    You reviewed a report by Mr. Crom?

10  A    Yes.

11  Q    A report by Mr. Tregellis?

12  A    Yes.

13  Q    A report by -- or reports by Mr. Pierotti?

14  A    Subsequent to the filing of these analyses, yes, I

15  reviewed Mr. Pierotti's reports.

16  Q    And --

17           MR. DAVIS: Excuse me, Your Honor.  To the extent

18  the witness is called to testify regarding Mr. Pierotti's

19  report, we did not receive a Rule 26 report on that as

20  required.  Mr. Pierotti's reports were done months before

21  this witness's report, and Rule 26 requires that if they're

22  going to do a rebuttal, they have to give us a rebuttal

23  report.

24           THE COURT: Well, he hasn't gotten around to

25  testifying on Mr. Pierotti's reports, and at the point at

1    which he does, you can raise your objection.

2              MR. DAVIS: Thank you, Your Honor.

3              THE COURT: He may never.

4    BY MR. DIVELBISS:

5    Q    With respect to -- again, you did an initial report

6    and then a supplemental report.

7    A    Correct.

8    Q    What did you do with respect to the first report?

9    A    I was asked a straightforward question.  What is

10   the -- as of August of 2005, what is the value as a going

11   concern of the Fotouhi Epps partnership, assuming that Mr.

12   Fotouhi was essentially not associated with that firm.

13   Q    And what is your opinion in that respect?

14   A    My opinion is that that three-partner entity,

15   essentially, had no value.

16   Q    And tell me if you could, or explain to the Court if

17   you would, what did you do to address the question and

18   formulate your opinion?

19   A    Well, in both -- in Mr. Crom's report as well as Mr.,

20   Tregellis' report, they note that Mr. Fotouhi was

21   responsible for in excess of 90 percent of the revenues of

22   Fotouhi Epps.  That as a starting point initially and

23   importantly raises the first flag with respect to the

24   going-concern value of an entity where Mr. Fotouhi is no

25   longer associated.  Basically the three remaining partners

1  would start from a position of having essentially,

2  virtually little or no revenue generation on their own.

3         Combined with that, statements by Mr. Epps and

4  Mr. Gilroy, I believe, that they would essentially not

5  remain as a partnership, that they would seek employment

6  elsewhere, leads to the conclusion that there essentially

7  would be no partnership.  In addition, looking at the

8  expenses of that entity, if you reduced revenues by 90

9  percent or more, there would be essentially no cash flow to

10 that entity.  And as a result, any estimation of the value

11 of that so-called entity would be essentially zero.

12 Q    Okay.  So you also spoke to the individuals that were

13 in the partnership, Mr. Epps and Mr. Gilroy?

14 A    No.  Those were statements made in Mr. Tregellis'

15 report as statements made to him by those two partners.  I

16 have spoken to Mr. Gilroy but not in the context of this

17 case.

18 Q    Okay.  Then you did a supplemental report.  Can you

19 tell me what you were asked to do with respect to the

20 supplemental report?

21 A    This was another relatively straightforward question,

22 and that was, as of August of 2005, what is the --

23 essentially the liquidation value of the Fotouhi Epps

24 partnership, again, assuming that Mr. Fotouhi would not be

25 associated with the firm, and that the firm in essence

1   would shutter its doors and cease operation.

2   Q    Okay.  So explain what you mean, again, by liquidation

3   value.

4   A    Liquidation, unfortunately, we can see it all around

5   us today, going out of business, essentially closing the

6   doors and ending the entity as it generally operates.

7   Q    Is there a single parameter or definition for a

8   liquidation value?

9   A    As I understand it, there are a number of degrees of

10  liquidation value with respect to valuing a distressed

11  liquidation versus an orderly liquidation.

12  Q    And an orderly liquidation would generally generate a

13  higher number; is that correct?

14  A    Yes.

15  Q    Why is that?

16  A    The firm being liquidated has time to more orderly

17  sell off assets with respect to obtaining a better price

18  for the value of those assets.

19  Q    And did you do an analysis under both the fire sale

20  and the orderly liquidation parameters?

21  A    No, I didn't make a bright line distinction.  I

22  assumed that the asset valuation that would be done would

23  essentially not involve a fire sale.

24  Q    So you chose the methodology that would, in your

25  opinion, generate the higher valuation under a liquidation

1  value.

2  A    Again, I didn't specifically look at that question in

3  a bright line sense, but I did not assume that assets would

4  be written down any degree below what they were listed at

5  book.

6  Q    Okay.  And again tell me what you did in order to

7  obtain a liquidation value for the Fotouhi, Epps, Hilger

8  and Gilroy partnership as of the date of the filing of the

9  petition.

10  A    I reviewed the analyses of Mr. Crom and Mr. Tregellis

11  and looked at essentially their starting point with respect

12  to assets and liabilities.  Mr. Crom notably did not

13  approach the question as if he was addressing the question

14  of liquidation value.  There is a reference in his report

15  to that concept.  Mr. Tregellis on the other hand takes a

16  direct view of the question of liquidation and notes that

17  there would have been a certain degree of costs associated

18  with the orderly closing of that entity.

19        So I started with the assets and liabilities.

20  Mr. Tregellis made a number of adjustments to Mr. Crom's,

21  both assets and liabilities, accounting for certain things

22  that Mr. Crom either included or didn't include and then

23  applied what he referred to as a "winding-down cost" to

24  reduce the net assets by these additional costs that would

25  be incurred in the process of liquidating Fotouhi Epps.

1  Q    Can you explain what you mean by a "winding-down

2  cost."

3  A    Well, Mr. Tregellis lists a number of them in his

4  report, essentially there's a cost to closing the doors.

5  Rent needs to be paid off and leases needed to be

6  terminated.  Employees, some employees need to be let go.

7  Others need to be held on to, to help with the orderly

8  liquidation.  Various relationships between vendors need to

9  be adjusted and terminated, and various other costs

10 associated with collecting accounts receivable and work in

11 progress need to be billed and collected.  And these are

12 costs that would be incurred that wouldn't be incurred if

13 you weren't planning to shut the doors.

14        MR. DAVIS: Your Honor, does the witness have some

15 third book up there that's not in evidence?  I think he's

16 got his own materials he's referring to, and I --

17        THE COURT: Isn't he allowed to do that?

18        MR. DAVIS: No, I object to him reading from Mr.

19 Tregellis' report, which is not in evidence.

20        THE COURT: Yes, but he's referred -- indeed, both

21 of his reports are based almost exclusively on Mr.

22 Tregellis' report.

23        MR. DAVIS: I understand that, but I think the

24 record should be clear that he's in fact reading from Mr.

25 Tregellis' report, which has not been marked as an exhibit.

1 The witness can look at things, but they still need to be

2 marked, and the record needs to be clear.

3       MR. DIVELBISS: Your Honor, I don't have any

4 problem submitting Mr. Tregellis' report if counsel --

5       THE COURT: All right. Let's admit it. Yes,

6 let's make that Exhibit -- I guess it would be E? Did you

7 letter your exhibits or number them? I hope you lettered

8 them. Yes, it would be Exhibit C. That's Exhibit C, the

9 Tregellis report.

10             (Whereupon, Defense Exhibit C, Mr.

11             Tregellis' report, is admitted

12             into evidence.)

13 BY MR. DIVELBISS:

14 Q   Anyway, you were just describing some of the winding-

15 down costs. And if you could elaborate on that just a

16 little bit more, I'd appreciate it.

17 A   Well, Mr. Tregellis did a specific analysis of those

18 costs and concluded that they would be approximately

19 $159,000. Mr. Crom made reference to it -- such costs, and

20 made an across-the-board estimation that 25 percent of

21 accounts receivable would be the target figure for a cost

22 of winding down the firm.

23 Q   Do you remember what the number was that Mr. Crom

24 suggested as an appropriate amount for winding-down costs?

25 A   You know, I don't think that Mr. Crom specifically

1 calculated that number. Footnote 7 to my supplemental

2 report notes that based on Mr. Crom's report, that 25

3 percent of the work in process and net receivables would

4 be -- I calculated it as $69,178.

5 Q    Okay. Did you consider any other factors, including

6 discounting accounts receivable, as part of your

7 liquidation analysis?

8 A    There were a number of receivables that Mr. Tregellis

9 adjusted based on I think a deeper analysis of writeoffs to

10 those accounts receivable, that lowered his accounts

11 receivable figure by $34,000 relative to Mr. Crom's. He

12 also included on the liability side a roughly $41,000

13 liability for a retirement payment that was due partners.

14 Mr. Tregellis lets that analysis or let that liability in.

15 And that accounted for some of the difference between Mr.

16 Tregellis and Mr. Crom, before getting to the question of

17 wind-down costs.

18 Q    Okay. In your number, did you consider the $41,000

19 retirement payment?

20 A    I did. I left it as a liability to the firm.

21 Q    Why is that?

22 A    As I understand it, it was a liability relative to

23 2004. I also understand through discussions with counsel

24 that that liability is a liability to the LLP and therefore

25 is an actual liability to the firm. Mr. Tregellis noted

1 that he didn't believe that it was appropriate to remove

2 that liability and so, given those factors, I left it in.

3 Q    Again, addressing the issue of write-downs of accounts

4 receivable, did you in fact as part of your analysis write

5 down some of the accounts receive that are existing as of

6 the date of the filing of the petition?

7 A    Yes.  I reviewed Mr. Tregellis' analysis of those

8 write-downs -- I'm sorry, the winding-down costs; is that

9 what we're talking about, I'm sorry.

10 Q    Yes.

11 A    Yes.

12 Q    Of the accounts receivable, of the accounts receivable

13 writeoffs.

14 A    Oh, accounts -- I'm sorry.  I subsequently reduced the

15 accounts receivable figure in Mr. Tregellis' report with

16 $71,000.  The work in process number was another $170,448.

17 Under an assumption that this firm would be liquidated, it

18 was clear to Mr. Tregellis -- and I concur -- that it would

19 be likely that an additional write-down of some percentage

20 would be required, given the likelihood of collecting on

21 work process, fees, as well as outstanding accounts

22 receivable would be reduced.  The probability of collecting

23 a hundred percent of that would be reduced, given that the

24 firm was being liquidated.

25 Q    And so you added this additional discount based upon

1  that fact that you just described.

2  A    A range between 20 and 30 percent.

3  Q    Okay.

4  A    Which was consistent with what Mr. Tregellis had done.

5  Q    Did you come up with a total amount that you believe

6  was appropriate for winding-down costs?

7  A    $159,000.

8  Q    And then did you make any other adjustments to come to

9  a liquidation value?

10  A    Just the ones we've discussed, and so when you take

11  into account those adjustments and include the winding-down

12  costs, the liquidation valued ranged from between 36,000

13  and $62,000.

14  Q    Why the range?

15  A    That's the 20 to 30 percent write-down of accounts

16  receivable.

17  Q    I see.  You're talking about the additional write-down

18  as a result of the fact it's being liquidated?

19  A    Correct.

20  Q    So if there was -- this 20 or 30 percent was not

21  included, you'd be at the $62,000 range.  If it was

22  included, you'd be at 36?

23  A    No.  If it weren't included at all, if the write-down

24  weren't included at all, it would be 114,000.  To get to

25  the 36 to 62, it's either a 20 percent or a 30 percent

1  additional write-down of the work in process and accounts

2  receivable figure.

3  Q    Okay.

4        MR. DIVELBISS: I have no more questions for Dr.

5  Mahta.

6                    CROSS-EXAMINATION

7  BY MR. DAVIS:

8  Q    Do I understand that the only documents you looked at

9  to prepare your report are Mr. Tregellis' report and Mr.

10  Crom's report?

11  A    Along with their supporting documents.

12  Q    So you looked at supporting documents.

13  A    I did.

14  Q    What did you look at?

15  A    There were some schedules that were attached to the

16  document I received that were detailed accounting records,

17  a Quick Book output, a number of computer outputs.

18  Q    So are you saying now that you prepared your own

19  analysis?

20  A    No.  I looked at those analyses and confirmed that

21  they were consistent with what was included in the initial

22  reports.

23  Q    You're talking about schedules to the reports.

24  A    In some cases, but there were also source documents.

25  Q    Why were you looking at source documents?

1  A    Well, because they were provided to me, and they -- I

2  looked at those to see if they were consistent with what

3  was reported by the two individuals.

4  Q    Did you talk to anybody at the partnership?

5  A    I did not.

6  Q    I guess you mentioned Mr. Gilroy.  You do other work

7  for him?

8  A    I did work on a case with Mr. Gilroy a couple of years

9  ago.

10  Q    But you've never talked to Mr. Gilroy about this

11  situation?

12  A    I did not.

13  Q    Nor Mr. Fotouhi.

14  A    I have spoken with Mr. Fotouhi.

15  Q    About this matter?

16  A    About this matter.

17  Q    Okay.  Was it before you did your reports?

18  A    Yes.

19  Q    And what did you discuss with Mr. Fotouhi?

20  A    I discussed the accounts receivable issue.

21  Q    And what did he tell you?

22  A    He told me that the accounts receivable at issue had

23  subsequently been written off.

24  Q    Okay.  And did you check him on that?

25  A    I did not check him, no.

1  Q    Did you talk to any of the other partners?

2  A    I did not.

3  Q    So you talked to Mr. Divelbiss apparently and got

4  information from him?

5  A    Yes.

6  Q    And you prepared no schedules of your own.

7  A    I did not.

8  Q    No analysis of your own?

9  A    Well, by analysis, I take that to mean did I look at

10  the analyses done and do a computation to get to the 36 to

11  $62,000.  I did that, yes.

12  Q    So the analysis contained in your written report is

13  the only analysis that you've done.

14  A    Correct.

15  Q    And have you ever -- do you know how old the partners

16  are of the partnership?

17  A    How old the partnership is or how old the partners are

18  themselves?

19  Q    The partners, the ages of the partners.

20  A    I don't know specifically, no.

21  Q    You've met Mr. Fotouhi, and Mr. Gilroy you've met, so

22  you have an idea about that, right?

23  A    Yes.

24  Q    And you've assumed all along that Fotouhi would not be

25  associated with -- essentially the buyer of the goods.

1  A    Well, that was my assumption, yes, my given

2  assumption.

3  Q    And do you have any reason to believe that that's what

4  happened?

5  A    It wasn't germane to my analysis.

6  Q    Why not?

7  A    Well, I was asked to assume that he would not be

8  associated.

9  Q    So you didn't take into consideration the fact that

10  the partners took over the assets after Fotouhi's

11  bankruptcy petition and treated them as their own from that

12  point forward?

13  A    Well, again, I was asked to do a valuation based on

14  a liquidation value.

15  Q    So you ignored that factor.

16  A    Well, let me put it this way, I didn't ignore the

17  assumption I was asked to make by counsel.

18  Q    Okay.  And you didn't check to see if there actually

19  were any expense related to collection of accounts

20  receivable; did you?

21  A    Well again, it was a counter-factual.  The firm didn't

22  liquidate, and so those costs associated with an estimate

23  of winding-down costs weren't ever incurred.

24  Q    So you concede that you're aware that there were no

25  such liquidation costs.

1  A    I don't know one way or the other.

2            MR. DAVIS: That's all I have.

3            MR. DIVELBISS: Your Honor, I'd move Exhibits A, B

4  and C into evidence.

5            MR. DAVIS: I object to C as hearsay, Mr.

6  Tregellis' report.

7            THE COURT: Overruled.  I'll admit it.  You didn't

8  give me a chance to ask this witness some questions.

9            MR. DIVELBISS: Oh, I'm sorry.

10           THE COURT: Doctor, do you know what the purpose

11 was for the Tregellis expert opinion?

12           THE WITNESS: The purpose?

13           THE COURT: Do you know why that opinion was

14 solicited or elicited?

15           THE WITNESS: I don't, not specifically.  As an

16 economic matter, it didn't much matter to me.

17           THE COURT: Right.  All right.  I don't have

18 anything else.  Do you have anything else?

19           MR. DIVELBISS: No, Your Honor, I do not.  The

20 only thing I would ask --

21           THE COURT: Then you may step down, sir, and you

22 may be excused.

23           THE WITNESS: Thank you.

24           THE COURT: Or you may stay.

25      (Laughter.)

1            THE WITNESS: I love Oakland, but --

2            THE COURT: Yes.

3            MR. DIVELBISS: Yes.  And a final thing, Your

4   Honor, in light of the fact that we've only recently filed

5   an answer that includes the Section 541(a)(6), we'd like to

6   ask that the matter be left open to allow us to present

7   testimony regarding the reasonable value of services to

8   collect the accounts receivable and/or to pursue the

9   matters that were clients of the firm as of the date of the

10  filing.

11           MR. DAVIS: Obviously we object to that.  They

12  didn't provide us with the evidence, and now they want to

13  reopen discovery and have another trial on a new issue.  If

14  they had said that when they made their motion to amend,

15  that would have been a basis for our objection, because

16  that would have delayed trial.

17           THE COURT: Well, as I think I've already

18  indicated, although I've allowed the answer to be filed --

19  I don't even think it's been filed yet -- but I've allowed

20  it to be filed.  The motion is denied, first because this

21  is an issue that has been implicit in all of these

22  lawsuits, or at least in one of the three, from the very

23  first day that they were filed.

24           Second, I'm not sure that given the fact that Mr.

25  Fotouhi's earnings from the law firm have not been

1  diminished whatsoever, and apparently Mr. Davis is not

2  seeking to claw those back, that 546 -- or the exception of

3  541(a)(6), regarding personal earnings of the Debtor, even

4  has any applicability here whatsoever at all.  So I'm

5  denying the motion, primarily on ground number one.

6  Anything else?

7            MR. DIVELBISS: Nothing further, Your Honor.

8            MR. DAVIS: No, Your Honor.

9            THE COURT: The exhibits are all admitted.  Do you

10  have any closing arguments?

11                        (Whereupon, Defense Exhibits A and

12                        B, are admitted into evidence.)

13            THE COURT: Do you have any closing arguments?

14            MR. DAVIS: Yes, Your Honor.  I'd like to take a

15  short break or recess?

16            THE COURT: Okay.  All right.  We'll stand in

17  recess for about 15, 20 minutes.

18            MR. DIVELBISS: Thank you.

19        (Whereupon, a recess is taken at 1:51 p.m., and the

20  court is reconvened at 2:08.)

21            THE CLERK: The court is reconvened pursuant to

22  the recess.

23            THE COURT: All right.

24                        CLOSING ARGUMENTS

25  BY MR. DAVIS:

1    Your Honor, Mr. Fotouhi filed bankruptcy on

2  August 29, 2005, at which time he was a partner in the

3  Fotouhi Epps Law Firm.  And for the next year and a

4  quarter, persisted in his position that the law firm was

5  worth nothing.  During that time, as Mr. Pierotti testified

6  and as the Trustee testified, the Trustee and his

7  representatives met with Mr. Fotouhi to try to value the

8  law firm, but he always took the position it was worth

9  nothing.

10    Now, we've come to trial and the only evidence

11  that Mr. Fotouhi puts on valuation is a secondhand witness

12  who tries to use the testimony of the expert from the case

13  back in 2007.  The only competent evidence, the only

14  valuation of anyone that took a real look at this case is

15  Mr. Pierotti, and Mr. Pierotti's numbers show that the

16  value of the law firm and its assets are $1,416,015, that

17  Mr. Fotouhi's interest is 38.59 percent, which comes out to

18  $546,440 -- and I think that's 19 cents.

19    THE COURT: 18.

20    MR. DAVIS: 18 cents.  Under Corporations Code

21  Section 16701(b), the Trustee is entitled to interest on

22  the value of Mr. Fotouhi's interest from the date of

23  disassociation.  And under Section 16701(i), the Court is

24  empowered to award attorneys fees, where the law firm

25  arbitrarily or vexatiously or not in good faith fails to

1    pay over the amount due.  Here, the law firm's only face

2    has been Mr. Fotouhi.  None of the other partners have --

3    they've allowed him to run the show.  He's the one that's

4    met with the Trustee.  He's the only one that showed up at

5    trial here today, and this Court has already found that his

6    position that he maintains for over two years was not in

7    good faith, his position that his interest was worth

8    nothing, and therefore, wearing his hat both as individual

9    and as the law firm's representative, his continued

10   persistence in saying that the value of his business was

11   zero, was not in good faith, and the Trustee should be

12   awarded attorney's fees.

13        We concede that, you know, the Trustee has

14   enumerated several issues, and we concede that the other

15   issues are duplicative of the valuation and award of the

16   value of the firm.  Therefore we don't need to set aside

17   any transfers or anything of that sort, and we concede the

18   Court's point.  I have researched the issue of partner

19   liability, and I concede it's a tough call, and the Court

20   has ruled on this, so I concede that we're not entitled to

21   a judgment against the individuals on that basis.

22        But as against the law firm, the evidence is

23   essentially undisputed that the valuation was that $546,000

24   number.

25        We've been here only a short time so I don't need

1  to reiterate any of the evidence, so unless the Court has

2  question, I'll stand aside.

3          THE COURT: I don't.

4                    CLOSING ARGUMENT

5  BY MR. DIVELBISS:

6          Thank you, Your Honor.  The threshold issue is --

7  that must be determined is whether as the Plaintiff/Trustee

8  would like the Court to do that it should be -- the

9  interest should be valued as if there was a dissolution or

10 whether there should be a disassociation.  That's a

11 threshold issue.  If Your Honor finds that, as specifically

12 stated in the California Corporation Code, a filing of

13 bankruptcy results in a disassociation, keeping in mind

14 that the law is that the plaintiff's interest in the

15 property is determined as of the date of the bankruptcy.

16 As soon as he files -- Mr. Fotouhi files bankruptcy, he

17 becomes disassociated -- he becomes a disassociated partner

18 and the estate is entitled to step in his shoes as a

19 disassociated partner as of that date.

20         How then is one to value that interest?  The

21 interest is valued and it's very clear under the Code, it's

22 the greater of the liquidation value or the value going

23 forward without Mr. Fotouhi.  The only evidence that's been

24 presented is that the value of the entity going forward

25 without Mr. Fotouhi as of the date the petition was filed,

1  again, that's the date of valuation, the appropriate date

2  of valuation, is zero.  The only other evidence of value is

3  the value that was submitted by Dr. Mahta, that the

4  liquidation value is somewhere between 36 and $62,000,

5  depending on whether this tribunal feels that it's

6  appropriate to discount the value of the existing accounts

7  receivable at that time.

8          So the amount that should be awarded, as we

9  acknowledge and have acknowledged for some time, is the

10  38.5 percent –- I think it's 38.59 or whatever the number

11  that Mr. Pierotti came up with, we're not disputing that at

12  this point, of somewhere between 36 and $62,000.

13          The issue of obtaining a portion of the fees that

14  were generated post-petition is, we believe, precluded by

15  several things.  First of all –-

16          THE COURT: Wait.  Let me ask you a question

17  first, Mr. Divelbiss.  Would you agree that when the

18  16701(b) speaks of a liquidation, that it speaks of an

19  orderly liquidation?

20          MR. DIVELBISS: it doesn't speak either way, Your

21  Honor, but we decided to take the more conservative, to

22  have a higher value.  A fire sale liquidation would have

23  been a lower value, but in an abundance of caution, I

24  instructed Dr. Mahta to do the higher value so that there

25  wouldn't be an argument as to whether it be  orderly or

1 | not.

2 | THE COURT: So an orderly liquidation could
3 | include the partners staying long enough -- even a
4 | disassociated partner staying long enough to collect the
5 | accounts.

6 | MR. DIVELBISS: And I apologize, Your Honor, could
7 | you state that again?

8 | THE COURT: What I'm saying is, that if you're
9 | going to have an orderly liquidation, that means we don't
10 | have a forced situation where every penny has to simply be
11 | taken for whatever is offered by clients, that the work
12 | can't be continued to its finish, so that the maximum
13 | amount of money is realized on any particular account
14 | receivable or client matter, rather the partners continue
15 | to operate the firm to maximize the value of those
16 | accounts, but in an orderly liquidation, you wouldn't take
17 | on new clients; you'd simply finish the business that was
18 | at hand.  In that sense, it's really not much different
19 | than the dissolution that's referred to later in the
20 | Uniform Partnership Act, that being at 16807, which doesn't
21 | describe how you do the dissolution, so much as describe
22 | what happened after the dissolution or as a result of the
23 | dissolution.

24 | So I'm not so sure that there's that much
25 | difference between -- the distinction you're trying to make

1 between a dissolution and a disassociation. But putting

2 that aside, an orderly liquidation would contemplate or

3 could contemplate that everybody sticks around to make sure

4 that all the business of the law firm that presently exists

5 is simply wrapped up. The accounts that can be collected

6 are collected. The work in process is completed so that

7 the value can be maximized and when that's all done and

8 everybody is paid off, and all of the liabilities are paid,

9 the doors close and that's the end of it.

10 MR. DIVELBISS: Certainly that could be a

11 possibility, Your Honor. Then the adjustment simply would

12 be, instead of the 20 to 30 percent discount on accounts

13 receivable, it may be the regular five or ten percent that

14 clients don't pay, as opposed to a larger discount.

15 THE COURT: Isn't that exactly really in essence

16 what happened here? It was in essence –- the closest thing

17 you could call it would be an orderly liquidation even

18 though really the firm has continued to operate, because we

19 didn't have the situation that's posited either by Mr.

20 Tregellis or by your witness that the accounts are worth

21 zero, because Mr. Fotouhi walks out. He didn't walk out.

22 He stayed, and he stayed and worked those clients and

23 worked those accounts and not only received value for the

24 firm, but received a substantial amount of salary and draw

25 as a result of working those account, even though those

1  accounts really belong to the –- in many respects belong to

2  the Chapter 7 Trustee.

3          MR. DIVELBISS: Well, I'm not sure I agree with

4  your last premise, Your Honor, because –-

5          THE COURT: What we see as partnership share

6  belong to the Chapter 7 Trustee, and he acted as though it

7  still belonged to him, that being Mr. Fotouhi.  And so did

8  the rest of the partnership.

9          MR. DIVELBISS: Well, again, the valuation is I

10  believe, as the Code indicates, and if as Your Honor is

11  suggesting that Mr. Fotouhi would have simply walked away,

12  then –-

13          THE COURT: That's not what I'm suggesting; that's

14  what your expert has posited that he would not be there

15  anymore, and that of course, is not what happened.

16          MR. DIVELBISS: But the reality is, if he would

17  have done that, then the value to the Trustee would have

18  been zero.

19          THE COURT: But he didn't.

20          MR. DIVELBISS: He did not, so the Trustee gets

21  the benefit of him staying there and gets his liquidation

22  value, whether it's as we posited at around 36,000 to

23  62,000, or somewhat higher in the range of about 20

24  percent, because of the liquidation –- the actual

25  liquidation was more orderly of those accounts.  But the

1   reality is, even under that scenario, as indicated by Dr.

2   Mahta, there are costs, general costs, associated with

3   winding down.  We're dealing with those accounts.  So it

4   may end up netting out where the winding-down costs are

5   functionally about equivalent to the discount for the

6   accounts receivable.

7           So again, those are the two valuation methods,

8   not the method that was submitted by Mr. Pierotti and the

9   plaintiffs.  That is an improper method to determine the

10  value of that interest as of the date of the petition.  Any

11  of the income that was received post-petition, beyond the

12  valuation as mandated by the California Corporations Code

13  for a disassociated partner, is I think, as a matter of

14  common knowledge, is that the income that was received

15  afterward, above what was just described, is work that is

16  due to –- or income that is due to post-petition work.

17          Now, there are cases that discuss situations when

18  there are contingencies, and I think that that situation is

19  particularly applicable.  So, for example, you have a

20  contingency matter that you eventually recover a hundred

21  thousand dollars, half the work is done pre-petition; half

22  of it is done post-petition, I think an appropriate

23  allocation in that situation would be $50,000 was due to

24  pre-petition work and therefore should be property of the

25  estate –-

1    THE COURT: This is Mr. Fotouhi's account.  This

2  is the partnership interest account.  This is the

3  partnership.  I don't know that that makes any –- that

4  those cases have any applicability here whatsoever.  What

5  is being valued here is not Mr. Fotouhi's personal

6  interests –- or excuse me, what is being valued here is his

7  personal interest in the law firm, in the partnership.

8    MR. DIVELBISS: Right.

9    THE COURT: And not any personal services that he

10 rendered post-petition.  These are not his personal

11 accounts.  These are the partnership's accounts.  He has an

12 interest in the partnership, and that is what is being

13 valued here.  I don't think those cases have any

14 applicability, the cases you're referring to, the <u>Jess</u>

15 case --

16    MR. DIVELBISS: Yes.

17    THE COURT: -- the <u>Simmons</u>, they just don't apply.

18 He wasn't in a sole proprietorship.

19    MR. DIVELBISS: No, he was in a partnership.

20    THE COURT: He was in a partnership, and those

21 cases all deal with sole proprietorships.

22    MR. DIVELBISS: But the underlying analysis is

23 applicable.

24    THE COURT: I don't think so.  That's just it.  I

25 think that's what <u>Simmons</u> basically says, that if you have

1   a situation where you're not dealing with a sole

2   proprietorship, but rather you're dealing with a

3   partnership or a corporation, the analysis doesn't apply.

4           MR. DIVELBISS: I think if -- there's one of the

5   cases that has to do with a corporation, but I believe that

6   that case -- and I don't know if it is <u>Jess</u> -- there was a

7   discussion --

8           THE COURT: <u>Jess</u> doesn't because <u>Jess</u> deals with

9   an individual law firm, a sole proprietorship.

10           MR. DIVELBISS: Okay.  And again, I believe in

11   that case, it talks about -- it talks about that if it is

12   income due to post-petition services, that income is not

13   recoverable.

14           THE COURT: That's right.  So they valued the

15   contingency, this contingent fee case, in a sole

16   proprietorship where he was working for himself --

17           MR. DIVELBISS: Right.

18           THE COURT:  -- they said that 78 percent of the

19   work done on that contingency case was done pre-petition,

20   and they said the estate is entitled to 78 percent of the

21   proceeds of that.

22           MR. DIVELBISS: And that makes perfect sense, Your

23   Honor.

24           THE COURT: Right, except the only difference is

25   that that was a sole proprietorship, and that's not what's

1  involved here.

2      MR. DIVELBISS: But what's involved is what to do

3  with the income that was received as a result of post-

4  petition work by Mr. Fotouhi or by the firm.  And if you

5  look at –- basically what <u>Jess</u> is saying is that if it was

6  pre-petition and you weren't paid yet, that's what the

7  contingency is.  You've done the work but you haven't been

8  paid –- if it's pre-petition that you haven't been paid,

9  that again goes into the accounts receivable and it's

10  discounted however the experts have discounted it, but for

11  work afterward, that is not –- that is not property of the

12  estate.

13      THE COURT: Let's look at the statute again.  It

14  says:

15          "Proceeds, product, offspring rents, or profits

16          of or from property of the estate, except such

17          earnings from services performed by an individual

18          debtor after the commencement of the case."

19  The Trustee has not claimed a single penny of anything that

20  Mr. Fotouhi earned as an individual after the case was

21  commenced.

22      MR. DIVELBISS: Yes, he has –-

23      THE COURT: He has not.  What he has –- he has not

24  claimed one penny of the draws that Mr. Fotouhi took from

25  this entity after the case was filed, not any –- he hasn't

1  claimed any.

2          MR. DIVELBISS: He has to have because --

3          THE COURT: He didn't.  He has claimed whatever it
4  is that the partnership owned, he has claimed 38.59 percent
5  of it, to the extent that the partnership owned accounts
6  receivable and work in process pre-petition.  That's what
7  he's claimed.  That's not the same as claiming, quote,
8  "earnings from services performed by an individual debtor
9  after the commencement of the case."

10          MR. DIVELBISS: But for hourly charges -- this is
11  not a contingency firm.  This is a firm that bills hourly,
12  as the records indicate.  So for the income that's received
13  post-petition, it has to have been received due to hourly
14  work that was done after the petition.

15          THE COURT: But it's not as though -- let's take
16  the usual case.  Supposing Mr. Fotouhi had $100,000 in
17  business, let's say, let's just say that this was
18  unliquidated matters.  It's hard to imagine the law -- this
19  is much easier when you're talking about insurance
20  companies or real estate brokers, because then you can
21  start to get a fix on what it is they need to do for the
22  money to actually come in post-petition.  But in the legal
23  services, perhaps it's even easier, because you would look
24  to see -- okay, what is it that the estate owns.  Well, it
25  owns this piece of business.  That's what the individual

1  had.  Now, this piece of business for pre-petition services

2  for work having been performed pre-petition is owed "X" and

3  the estate obviously is entitled to that.

4         But if the debtor, the individual involved, has

5  to continue to work on that matter, and will get billings

6  from it thereafter post-petition, then no, the estate

7  wouldn't be entitled to it.  That's not what's involved

8  here.  What's involved here is, Mr. Fotouhi continued to be

9  a partner in a law firm and take draws from the law firm.

10  The accounts receivable and the work in process that were a

11  part of the law firm consisted of or the assets of the law

12  firm consisted of, the estate would be entitled to one-

13  quarter of those and is not seeking anything that Mr.

14  Fotouhi might make as a draw off of this entity.  It's just

15  different.  It isn't the same as what's involved in

16  Simmons; what's involved in Jess; what's involved in

17  Tulley, which is another Bankruptcy Appellate Panel case, I

18  think involving real estate brokerage fees, maybe it was

19  insurance; I don't remember.  It's just not the same as

20  what we've got here.

21         MR. DIVELBISS: In many respects you're right, and

22  the reason that -- from our perspective -- we agree that a

23  contingency situation or a situation with insurance or a

24  real estate broker is different is because the fees that

25  are generated post-petition may not be related to the post-

1  petition work.  Yet in a law firm that bills hourly, all of

2  those fees are necessarily related to the time and expense

3  that was done post-petition.

4        THE COURT: The difference is Mr. Fotouhi does not

5  own the account.  That's the difference.  He does not own

6  the asset.  The partnership does.  And therefore anything

7  he earns, he earns from the partnership, not from the work

8  he does.

9        MR. DIVELBISS: Well, that assumes -- that assumes

10  that he was not disassociated, and he was.

11        THE COURT: Oh, he was associated.  To the

12  contrary, it assumes he was associated because if he

13  weren't, he wouldn't be entitled to anything from the

14  partnership.

15        MR. DIVELBISS: No, that assumes he was not

16  disassociated by filing a bankruptcy.

17        THE COURT: Well, except that to a large extent

18  what the Uniform Partnership Act contemplates never

19  happened here.  He wasn't disassociated, ever.  He's still

20  there.

21        MR. DIVELBISS: Once he files for bankruptcy, as

22  soon as that is file stamped, he is disassociated --

23        THE COURT: I know, but -- maybe that's so, but

24  that blinks at reality.  The reality is, that whatever the

25  Code says, they should have liquidated or they should have

1  treated him as a disassociated partner from that bankruptcy

2  forward, but they didn't.  Instead what they did was they

3  continued to make money individually from the partnership,

4  including from his share, which was something at that point

5  they didn't own, or they shouldn't have owned.  As a matter

6  of fact, they never made an offer to buy him out as Section

7  16701(a) requires, which is the first section in the

8  statute.  They never made that offer, which they should

9  have done, and they never did any of the things that this

10  Code section contemplates.  So I would agree with you.

11  They should have simply broken the law firm up as of the

12  date of filing the bankruptcy, but they paid no attention

13  to the statute.

14       MR. DIVELBISS: But the firm was broken up as of

15  the date --

16       THE COURT: No, it wasn't.

17       MR. DIVELBISS: -- as a matter of law, because

18  he's a disassociated partner.

19       THE COURT: It may have been as a matter of law,

20  but it wasn't as a matter of fact, because they never filed

21  anything; they never did anything; they never -- nothing

22  happened that complied with the law.  Did it?  The law firm

23  is still there.  The same partners are still there.  The

24  same meaningless partnership LLP agreement is still there,

25  even though it's been changed orally now, we hear, by Mr.

1  Fotouhi, and even though they had a person named in that

2  partner or that was a partner, that I never heard of, even

3  though I spent, I don't know how many days in trial dealing

4  with the partnership, suddenly I'm finding out about -- who

5  is it, Mr. Unnelly (Phonetic)?

6          MR. DIVELBISS: Yes.

7          THE COURT: I never heard of him.  Not once, I

8  don't think you can comb the seven or eight or 900 pages of

9  transcript I have of the first trial in this case, did his

10  name ever come up, and suddenly today, I'm finding out he

11  was a partner all along, and just went senior status in

12  January.  So if you want to talk about what really happened

13  as opposed to what should have happened, those are two very

14  different things.

15          MR. DIVELBISS: Well, Your Honor, again, I think

16  the law is clear.  What happened is he became

17  disassociated.  With respect to buying that interest, there

18  were multiple attempts to find out what the Trustee wanted.

19  There were offers.  There was a statutory offer that was

20  served during the pendency of this litigation.  So to

21  suggest --

22          THE COURT: I'm not familiar with that.  Is that

23  an exhibit someplace?

24          MR. DIVELBISS: No, but it was served upon the

25  Trustee --

1          THE COURT: I don't believe I've ever seen it.

2          MR. DIVELBISS: It may not have been filed.  It

3 was I believe just served, and I think the rules just

4 require that you serve it.  It was served --

5          THE COURT: You served something pursuant to

6 16701; is that what you're talking about?

7          MR. DIVELBISS: We served a settlement offer under

8 the Federal Rules of Civil Procedure.

9          THE COURT: Oh, that's different.  No wonder I

10 didn't see it.  I shouldn't see it.  I'll let you finish.

11          MR. DIVELBISS: Thank you, Your Honor.

12          THE COURT: Uninterrupted.  I'll try.

13          MR. DIVELBISS: No, actually, I appreciate the

14 questions, it's in some respects, kind of an interesting

15 interplay.  But in any event, I think as a matter of -- as

16 was indicated, as a matter of -- Your Honor referred to it

17 as reality -- any money that was generated by Mr. Fotouhi

18 or by the firm was generated by using personal services

19 after the date of the filing.  I believe 541(a)(6)

20 precludes recovery of any those.  The only thing that the

21 Trustee is entitled to, as a matter of law, is the

22 liquidation value which is, as indicated, somewhere between

23 36 and $62,000, unless Your Honor feels it's appropriate to

24 adjust it up because of the fact that -- of a likely and

25 orderly liquidation, although Dr. Mahta testified to that

1  effect that in fact he used a –- came up with a higher

2  value because he did assume that it would be an orderly

3  liquidation, based upon some of the same issues Your Honor

4  raised.

5      And finally with respect to the <u>Jewel versus</u>

6  <u>Boxer</u> fees, again, <u>Jewel versus Boxer</u> is applicable in a

7  situation where there's a dissolution. That's the only

8  time it's applicable. The case says that explicitly; it's

9  applicable only when there's a dissolution. If there was

10 even a disassociation or, Your Honor has indicated you

11 believe there was in effect nothing, in which case, then

12 <u>Jewel versus Boxer</u> would not be applicable, particularly in

13 light of the amendment to the Uniform Partnership Act.

14      Unless Your Honor has any other questions, the

15 Defendants are resting.

16      THE COURT: Okay. Thank you.

17      MR. DIVELBISS: Thank you, Your Honor.

18      THE COURT: Look folks, it's been a trial

19 that's -- other than various objections and colloquy

20 between counsel and the Court, that really has only been a

21 couple of hours long, and I spent -- I hope it's -- I guess

22 maybe it isn't –- but I spent quite a bit of time both

23 reading the cases that have been cited to me, researching

24 the law myself, and reading the statutes and the documents

25 that are involved here. And boiled down to its essence,

1  there really is only one factual issue here, of any note,

2  and that is, what is the value of the partnership interest

3  as of the date of the filing of the petition.

4        And I believe that, while I do not agree with how

5  he characterizes his report as being sort of a going-

6  concern valuation, but not a liquidation valuation, I

7  believe all of the numbers that I need in order to

8  determine what that liquidation value ought to be for

9  purposes of Section 16701(b), I have in Mr. Pierotti's

10 report.  And I credit those numbers and do conclude that

11 the appropriate valuation for liquidation, an orderly

12 liquidation of this partnership interest, is $546,440.18.

13        In reaching this conclusion, I specifically

14 reject the valuation that was tendered -- both of the

15 valuations that were tendered by Dr. Charles R. Mahta,

16 first, because he relief almost completely upon a valuation

17 that I had previously rejected, and which rejection was

18 affirmed, I might add, by the Bankruptcy Appellate Panel in

19 their October -- excuse me for just a second -- 16th, 2008

20 decision at page 19 through page 22.  I incorporate by

21 reference -- and this can be found, of course, in Exhibit

22 4, my reasons for rejecting the Tregellis valuation in the

23 previous trial, and I'm incorporating the same reasons for

24 rejecting the Tregellis valuation and the doctor's

25 valuation, Dr. Mahta' valuations, in this trial.

1    I would add that Dr. Mahta specifically based his

2 valuation on, quote, "as of August 29, 2005, assuming that

3 Mr. Fotouhi would no longer be associated with FEHG.  The

4 fact is that he was and did continue to be associated with

5 FEHG, and I don't need to resort to the hypothetical

6 liquidation value that I ordinarily would have to resort

7 to, had the statute, that being 16701, been complied with.

8 The reason is because no one complied with Section 16701

9 and instead there was no disassociation of Mr. Fotouhi.  He

10 remained a part of the law firm even though he wasn't

11 supposed to.  He was supposed to have been disassociated,

12 just as Mr. Divelbiss indicates.  Instead he and his

13 partners continued to work on and profit from the very

14 accounts that were a part of the partnership interest and

15 that were pre-petition accounts that would have made up the

16 estate's interest in that partnership.

17    So we don't have to guess what the liquidation

18 value of those account is; we know what it is, because we

19 have the numbers that were generated, the dollars that were

20 generated, post-petition, from those accounts, and thus

21 were proceeds of those accounts and specifically included

22 under 541(a)(6), and those numbers are in total $1,416,015.

23 That encompasses $404,700 as of the date of the filing of

24 the petition plus proceeds from those accounts and work in

25 progress or process, of $1,011,315, post-petition.

1       None of that should be reduced by the second

2 clause of 541(a)(6) because Mr. Fotouhi wasn't a sole

3 proprietorship, and any money that he derived from those

4 accounts, he derived through the partnership itself, none

5 of which is sought by the Trustee and none of which, so far

6 as anyone can tell, is diminished.

7       Now, there's been an issue raised about whether

8 or not the $1,400,000 plus change should be reduced because

9 of the cost that would have had to have been expended in

10 manpower and thus billable hours to actually collect those

11 accounts.  So far as I can tell, that information was under

12 the control, exclusive control of Mr. Fotouhi and of the

13 law firm.  They have not presented evidence as to how much

14 actually should be credited against that amount or that

15 manpower or those billable hours.

16       So far as I can also tell, that information was

17 never turned over either to the expert for the plaintiff,

18 Mr. Pierotti, or to the law firm for the Trustee or to the

19 Trustee himself.  In order to have figured that out, you

20 would have had to have known how many hours were devoted by

21 whom at what point to the pre-petition accounts receivable

22 and works in process.  No evidence has been presented on

23 that point, and so far as I'm concerned, it was up to the

24 Defendant, since the Defendant controlled those records, to

25 present that, if such a defense were to be tendered.

1       And so I'm not giving any credit for that.  There
2   has been an overhead amount that has been credited that is
3   encompassed within the $1,416,015, I think at 56 percent,
4   which I think is a pretty generous number.  Now that leads
5   us to attorney's fees, that the Trustee has requested under
6   Section 16701.  I have to say that this is a very, very
7   close question.  The Code says in part (i) of that section:
8               "The court may assess reasonable attorney's fees
9               and the fees and expenses of appraisers and other
10              experts for a party to the action in amounts the
11              court find equitable against a party that the
12              court finds acted arbitrarily, vexatiously, or
13              not in good faith.  The finding may be based on
14              the partnership's failure to tender payment or an
15              offer to pay or to comply with subdivision (g).
16              Subdivision (g) requires that the payment or a
17              tender as required by (e) and (f) of the statute
18              shall be accompanied by all the following."
19      And then it lists four parts that it must
20  include.  I have no evidence that that tender was ever
21  made.  And it seems to me that on balance, the estate
22  should not have to pay for what should have been done here
23  long ago, and that is, that there should have been a good
24  faith tender for what Mr. Fotouhi's partnership interest
25  was worth.  I have no evidence that that ever was really

1  done, and certainly no evidence that it was done in this

2  forum, in other words, that Section 16701(a) was ever

3  complied with.

4         So it seems to me that some attorney's fees ought

5  to be awarded, and frankly, given the fact that Mr.

6  Fotouhi -- all the evidence indicates that Mr. Fotouhi was

7  the controlling partner in this law firm -- everyone agrees

8  that without him, there was no law firm -- the he ought to

9  be the one that ought to have to pay this.  So I am going

10  to award, even though I realize it is not -- undoubtedly is

11  not a full compensatory award that I could award for

12  attorney's fees here, I am going to award attorney's fees

13  of $25,000 specifically payable by Mr. Fotouhi himself.

14  It says it doesn't have to be the partnership itself; it

15  can be against a party that the Court finds -- arbitrarily,

16  vexatiously or not in good faith.  At the very least, I

17  find Mr. Fotouhi did not act in good faith in this case.

18         As to interest, this statute also calls for an

19  interest award, but I haven't awarded an interest amount,

20  and I'm not going to award interest here.

21         As for personal liability of the partners, which

22  was alleged and pled, Mr. Davis has now withdrawn that

23  request, so that except for the $25,000 in attorney's fees

24  I'm awarding against Mr. Fotouhi, there will be no personal

25  liability of any individual partner.

1    Now, are there any questions or is there anything
2    else that I need to cover?  This shall constitute my
3    findings of fact and conclusions of law, and if you want a
4    copy of it, you can request a copy of the transcript.

5    MR. DAVIS: Other than -- would you like us to
6    prepare an order, or --

7    THE COURT: A judgment entry.

8    MR. DAVIS: A judgment, excuse me.

9    THE COURT: Anything else?

10   MR. DIVELBISS: The only thing, Your Honor, is --
11   it has to do with the attorney's fees award.  I would have
12   thought that that would have been done as an attorney's
13   fees application and evidence could have been presented by
14   the Defendants of their multiple good faith attempts to try
15   and deal with this.

16   THE COURT: I'll tell you what I'll do, Mr.
17   Divelbiss, I will require Mr. Davis to submit his time
18   sheets on these cases and if they are more than $25,000,
19   then it'll still be $25,000.  If they're less than $25,000,
20   then it will be whatever it is that's less than $25,000.
21   And if you want to then object to his fees, you may do so.

22   MR. DIVELBISS: Okay.

23   THE COURT: All right?

24   MR. DIVELBISS: Thank you, Your Honor.

25   MR. DAVIS: Just procedurally, Your Honor, should

1   I just submit a declaration with the --

2         THE COURT: With the time sheets.  You don't have

3   to put together a fee application.

4         MR. DAVIS: No, I understand.  Okay.  I'll do it

5   that way.

6         THE COURT: And you'll have ten days from the time

7   he submits those fees to respond.

8         MR. DIVELBISS: Thank you.

9         THE COURT: Okay.

10        MR. DAVIS: Thank you, Your Honor.

11        THE COURT: We'll stand adjourned for the day.

12     (Whereupon, the proceedings are concluded at 2:48

13   p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5                    CERTIFICATE OF TRANSCRIBER

6

7          I certify that the foregoing is a correct

8   transcript from the digital sound recording of the

9   proceedings in the above-entitled matter.

10

11  DATED: June 5, 2009

12                          By:___/s/ Jo McCall_____

13

14

15

16

17

18

19

20

21

22

23

24

25